# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK BEARD, Derivatively on Behalf of FMC CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MARK A. DOUGLAS, ANDREW D. SANDIFER, PIERRE R. BRONDEAU, EDUARDO E. CORDEIRO, JOHN DAVIDSON, KATHY L. FORTMANN, C. SCOTT GREER, K'LYNNE JOHNSON, DIRK A. KEMPTHORNE, MARGARETH ØVRUM, ROBERT C. PALLASH, PATRICIA VERDUIN, and VINCENT R. VOLPE, JR.,<br><br>Defendants,<br><br>and<br><br>FMC CORPORATION,<br><br>Nominal Defendant. | Case No:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mark Beard ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of and for the benefit of Nominal Defendant FMC Corporation ("FMC" or the "Company"), submits this Verified Shareholder Derivative Complaint against Mark A. Douglas ("Douglas"), Andrew D. Sandifer ("Sandifer"), Pierre R. Brondeau ("Brondeau"), Eduardo E. Cordeiro ("Cordeiro"), John Davidson ("Davidson"), Kath L. Fortmann ("Fortmann"), C. Scott Greer ("Greer"), K'Lynne Johnson ("Johnson"), Dirk A. Kempthorne ("Kempthorne"), Margareth Øvrum ("Øvrum"), Robert C. Pallash ("Pallash"), Patricia Verduin ("Verduin"), and Vincent R. Volpe, Jr. ("Volpe") (the "Individual Defendants" and together with FMC, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the

1

federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of filings by FMC with the United States Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts and shareholder communications, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.    This is a shareholder derivative action brought against certain current and former FMC officers and members of FMC's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants from February 9, 2022 through February 4, 2025 (the "Relevant Period").

2.    FMC is a global agricultural sciences company that develops and sells a range of crop protection products. The Company describes itself as "a global agricultural sciences company" and states that it is "the fifth largest global innovator in the agrochemicals/crop protection market."

3.    FMC divides its operations into four major regions: North America, Latin America ("LATAM"), Asia-Pacific ("APAC"), and Europe, the Middle East, and Africa ("EMEA").

4.    In 2017, the Company acquired two diamide insecticides, called Rynaxypyr and Cyazypyr. FMC claimed that this acquisition would sufficiently increase the Company's revenue to position the Company as one of the largest agricultural companies worldwide.

5.    However, beginning in May 2023, the Company gradually revealed that inventory

issues were negatively impacting the Company's revenue, and that, as a result, the Company had reduced guidance for the 2023 fiscal year.

6.      Then, in September 2023, Blue Orca Capital published a report explaining that, due in part to issues related to the enforceability of FMC's patents over Rynaxypyr and Cyazypyr, there had been an influx of generic diamide products into markets in India, China, and Brazil.

7.      On this news, the price of the Company's stock price fell 7.4% in a single day, from a closing price of $82.19 per share on September 6, 2023, to close at $76.10 per share on September 7, 2023.

8.      On October 23, 2023, FMC again reduced its guidance, citing continued issues with inventory and stating that the Company did not expect "destocking conditions . . . to improve in the near-term."

9.      On this news, the Company's stock price declined approximately 16%, from a closing price of $66.95 per share on October 20, 2023 to a closing price of $56.11 per share on October 24, 2023.

10.     On October 30, 2023, the Company revealed in a press release that it was experiencing significant cash flow limitations as a result of "higher inventory and lower payables." The Company further revealed that it had experienced lower than expected revenues across all four of the Company's regions, largely as a result of "[l]ower volumes in all regions caused by destocking from channel customers and partners."

11.     On this news, the Company's share price fell more than 8%, from a closing price of $57.96 per share on October 30, 2023, to closing price of $53.20 per share on October 31, 2023.

12.     In response to its revenue slowdown and destocking issues, the Company launched "Project Focus", a strategic restructuring initiative that aimed to maximize the Company's

efficiencies, right-size its cost base, and work to normalize the inventory levels of its distributors.

13.    After implementing Project Focus, the Individual Defendants repeatedly represented to investors that FMC's channel inventories were normalizing and that the associated cost reductions would contribute to FMC's future profits. However, these representations failed to disclose that FMC effectively passed a large portion of these expected profits to its distributors by implementing "cost-plus" pricing agreements with several of its distributors.

14.    The truth emerged on February 4, 2025, when the Company reported its fourth quarter 2024 revenue, admitting it had missed consensus revenue estimates by $90 million. At this time, FMC also announced that "growth was below [FMC's] expectations" because it had discovered that during that quarter, "customers in many countries sought to hold significantly less inventory than they [had] historically." FMC paired this with the issuance of a pessimistic financial outlook for 2025, which was the result of "weaker demand in the channel" caused by "customers in many countries prioritiz[ing] holding lower-than-historical levels of inventory."

15.    On this news, the Company's share price declined more than 33%, from a closing price of $54.04 per share on February 4, 2025 to a closing price of $35.92 per share on February 5, 2025.

16.    As a result of the foregoing, the Company, as well as Defendants Douglas and Sandifer, were named as defendants in multiple now-consolidated federal securities fraud class action lawsuits pending in this Court, captioned: (1) *In Re FMC Corporation Securities Litigation*, Case No. 2:23-cv-04398; and (2) *Mohammed v. FMC Corporation, et al.*, Case No. 2:25-cv-00771 (the "Securities Class Actions.") On July 17, 2024, Plaintiff in *In Re FMC Corporation Securities Litigation* filed an amended complaint (the "Amended Complaint") reiterating certain allegations made in the initial complaint and including statements from former FMC employees in support of those allegations. The Securities Class Actions have further subjected FMC to the need to

undertake internal investigations and the need to implement adequate controls, as well as exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 14(a), and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78n(a)(1) and 78u-4(f)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) FMC maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

22.      Plaintiff is a current shareholder of FMC and has continuously held FMC common stock at all relevant times.

23.      Nominal Defendant FMC is a Delaware corporation with its principal executive offices located at 2929 Walnut Street, Philadelphia, Pennsylvania 19104. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FMC."

24.      Defendant Douglas served as the Company's President and Chief Executive Officer ("CEO") and as a Company director from 2020 until 2024. According to the proxy statement filed on Schedule 14A with the SEC on March 14, 2025 (the "2025 Proxy"), in 2024, Defendant Douglas received $14,968,954 in total compensation from the Company.

25.      Defendant Sandifer has served the Company's Chief Financial Officer ("CFO") since 2018. According to the 2025 Proxy, in 2024, Defendant Sandifer received $3,485,618 in total compensation from the Company.

26.      Defendant Brondeau has served as the Company's CEO since June 2024 and as Chairman of the Board since 2010. According to the 2025 Proxy, in 2024, Defendant Brondeau received $251,837 in total compensation from the Company.

27.      Defendant Cordeiro has served as a Company director since 2011. Defendant Cordeiro also serves as the Chair of the Board's Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2025 Proxy, in 2024, Defendant Cordeiro received $280,031 in total compensation from the Company.

28.      Defendant Davidson has served as a Company director since 2020. Defendant Davidson also serves as a member of the Board's Audit Committee and as Chair of the Nominating and Corporate Governance Committee. According to the 2025 Proxy, in 2024, Defendant

Davidson received $260,031 in total compensation from the Company.

29.    Defendant Fortmann has served as a Company director since 2022. Defendant Fortmann also serves as a member of the Board's Nominating and Corporate Governance Committee. According to the 2025 Proxy, in 2024, Defendant Fortmann received $255,031 in total compensation from the Company.

30.    Defendant Greer has served as a Company director since 2002. Defendant Greer also serves as a member of the Board's Nominating and Corporate Governance Committee. According to the 2025 Proxy, in 2024, Defendant Greer received $270,031 in total compensation from the Company.

31.    Defendant Johnson has served as a Company director since 2013. According to the 2025 Proxy, in 2024, Defendant Johnson received $275,031 in total compensation from the Company.

32.    Defendant Kempthorne has served as a Company director since 2009. According to the 2025 Proxy, in 2024, Defendant Kempthorne received $257,544 in total compensation from the Company.

33.    Defendant Øvrum has served as a Company director since 2016. Defendant Øvrum also serves as a member of the Board's Nominating and Corporate Governance Committee. According to the 2025 Proxy, in 2024, Defendant Øvrum received $240,031 in total compensation from the Company.

34.    Defendant Pallash has served as a Company director since 2008. Defendant Pallash also serves as a member of the Board's Audit Committee. According to the 2025 Proxy, in 2024, Defendant Pallash received $245,031 in total compensation from the Company.

35.    Defendant Verduin has served as a Company director since 2023. According to

the 2025 Proxy, in 2024, Defendant Verduin received $247,999 in total compensation from the Company.

36.     Defendant Volpe served as a Company director from 2007 until 2023. According to the proxy statement filed on Schedule 14A with the SEC on March 10, 2023 (the "2023 Proxy"), in 2022, Defendant Volpe received $260,088 in total compensation from the Company.

### Non-Party Directors

37.     Non-Party Anthony DiSilvestro has served as a Company director since December 2024. According to the 2025 Proxy Statement, in 2024, DiSilvestro received $80,031 in total compensation from the Company. DiSilvestro is named herein solely for the purposes of demand futility.

38.     Non-Party Steven T. Merkt has served as a Company director since April 2025. Merkt is named herein solely for the purposes of demand futility.

39.     Non-Party John M. Raines has served as a Company director since 2024. According to the 2025 Proxy Statement, in 2024, Raines received $168,902 in total compensation from the Company. Raines is named herein solely for the purposes of demand futility.

### Confidential Witnesses

40.     The Amended Complaint in the Securities Class Action contains statements from a number of former FMC employees who offered their experiences in support of the allegations contained therein.

41.     FE-1 worked for the Company from 2019 until mid-2022. Beginning in early 2021, FE-1 worked as a Manager for the Company's Structured Finance Group for its LATAM region. As such, FE-1 issued credit to FMC customers and managed the sale of customer debt to third parties. FE-1 reported to William Mills, FMC's CFO for the Americas, who reported directly

to Defendant Sandifer.

42.    FE-2 worked for the Company for over twenty-five years, until early 2022. For most of this time, FE-2 worked as a manager of FMC's business in multiple countries in Southwest Asia. FE-2 reported directly to the head of FMC's Asia-Pacific segment.

43.    FE-3 worked for the Company for over four years, until mid-2022. FE-3 was employed as a member of the Company's Demand Planning team for its EMEA segment. As such, FE-3 was responsible for oversight of supply chains, sales, and demand trends. FE-3 reported to the heads of the Company's European business, Marc Hullebroek and Sebastian Pons, each of whom reported in turn to Defendant Douglas.

44.    FE-4 worked for FMC for over twenty years, until mid-2022. From 2020 onwards, FE-4 worked for the Company's Product Engineering and Precision Agriculture Group. FE-4's responsibilities included, *inter alia*, expanding the use of mechanical application technologies with the Company's products by farmers.

45.    FE-5 worked at FMC from late 2022 until early 2024 at the Company's headquarters in Philadelphia, Pennsylvania. FE-5 was a member of the Integrated Accounts Team for the North America region, and his responsibilities, *inter alia*, included oversight of orders made by distributors across the North American region.

46.    FE-6 worked at FMC for over twelve years, until mid-2022. For the last five years of FE-6's employment at FMC, FE-6 worked as a manager for the Company's Pakistan business. In this position, FE-6 was responsible for, *inter alia*, procurement, product warehousing, and supplying FMC's Pakistani dealers.

47.    FE-7 worked at FMC for over ten years, until early 2022. FE-7 was a manager in FMC's Finance and Supply Chain Group for its Southwest Asia operations. In this position. FE-7

reported to Sujit Mukherjee, who was FMC's Director of Asia Finance and as such reported directly to Defendant Sandifer.

48.     FE-8 worked at FMC for over three years, until early 2022. FE-8 was a member of FMC's Enterprise Governance and Continuous Improvement Group and additionally worked in Business Process Management at FMC's Philadelphia, Pennsylvania headquarters. FE-8's team was primarily responsible for implementing a Systems Applications and Data Processing ("SAP") program. The SAP program was a centralized system enabling FMC to access Company-wide data pertaining to all facets of its business, including invoices, sales, pricing, and inventory.

49.     FE-9 worked for FMC for over seven years, until mid-2024, as a Regional Business Manager in the Midwest United States. FE-9 was primarily responsible for facilitating sales by FMC to its distributors and from those distributors to retailers. FE-9 reported to Regional Director Randy Young, who reported to FMC's Director of Sales for North America. This Director of Sales for North America reported directly to Defendant Douglas.

50.     FE-10 worked for FMC for over twenty years, until early 2024, as a Retail Market Manager in the Midwest United States and was primarily responsible for working with distributors to facilitate their purchases of FMC products.

51.     FE-11 worked at FMC from early 2020 until early 2023 as a Regional Sales Manager for the Midwest United States. FE-11 was primarily responsible for facilitating the sale of Company products from distributors to retailers, as well as handling customer complaints. FE-11 worked closely with retailers to ensure they had adequate supplies of FMC products, including Diamides.

52.     FE-12 worked at FMC from 2019 until late 2022 as a Global Research and Development Scientist. FE-12 worked with process engineering and related patents for the

Company's products, including FMC's diamide products.

53.    FE-14 worked at FMC for over eight years, until early 2023. During this time, FE-14 worked as a National Sales Manager in the Company's Southwest Asia segment. In that position, FE-14 worked with FMC's Country Manager to facilitate the sale of Company products to distributors and dealers.

54.    FE-16 worked at FMC from mid-2023 until late 2024 as an Analyst in FMC's Financial Planning and Analysis Group at the Company's Philadelphia, Pennsylvania headquarters. FE-16 was responsible, *inter alia*, for financing matters related to third-party manufacturers of FMC products.

55.    FE-19 worked at FMC for more than five years, until mid-2023, in FMC's Finance Team and Demand Team for EMEA. In this position, FE-19 duties involved, *inter alia*, managing financial matters related to the Company's operations in Southwest Europe, as well as monitoring demand for the FMC products across EMEA.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

56.    By reason of their positions as officers, directors, and/or fiduciaries of FMC and because of their ability to control the business and corporate affairs of FMC, the Individual Defendants owed FMC and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage FMC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of FMC and its shareholders.

57.    Each director and officer of FMC owes to FMC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of FMC and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

58.    The Individual Defendants, as officers and/or directors of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, had a duty to promptly disseminate accurate and truthful information regarding FMC's operations, finances, financial condition, financial statements, performance, growth, earnings, internal controls, and present and future business prospects so that the market price of FMC's stock would be based on truthful, accurate, and fairly presented information.

59.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of FMC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by FMC. Because of their advisory, executive, managerial and directorial positions with FMC, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of FMC.

60.    The Individual Defendants, as officers and/or directors of FMC, were required to discharge their duties by exercising reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of FMC. By virtue of such duties, the officers and directors of FMC were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, ethical, and businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide the public, investors, and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of internal legal, financial, and management controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

61.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to FMC and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

62.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of FMC, the absence of good faith on their part, and a reckless disregard for their duties to FMC and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

13

63.     The Individual Defendants breached their duties of loyalty and good faith by causing FMC to issue false and misleading statements concerning its financial condition. As a result, FMC has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## CODE OF ETHICS AND BUSINESS CONDUCT

64.     FMC maintains a Code of Ethics and Business Conduct (the "Code of Conduct"), which contains an opening message from Defendant Brondeau, stating that:

> At FMC, we are committed to conducting our business with honesty and integrity and complying with all applicable laws. FMC's Code of Ethics and Business Conduct ("Code") exemplifies our dedication to these high business standards. The Code summarizes the legal and ethical principles that we follow in our daily work and applies these principles to our policies and practices.

65.     In a subsection titled "Commitment to Ethics," the Code of Conduct states that: "Behavior reflecting high ethical standards is expected of all directors, employees and others who are bound by the Code, regardless of position or location. No director, officer, manager or supervisor has the authority to violate or require conduct by another employee or any other person that violates the Code."

66.     In a subsection titled "We Comply with the Code, Other FMC Policies, and All Applicable Laws," the Code of Conduct provides the following, in relevant part:

> e comply with the Code, other FMC policies and all applicable laws in conducting our business. There are countries where common trading or negotiating practices are based on codes of conduct that are less stringent or different than the Code. In such countries, employees should follow the Code, except for variances that are permitted by applicable law and are based on good ethical and business judgment. The relevant regional president or department head, or a president or vice president of FMC Corporation if no division manager is available, must approve any such variance in writing. Contact an FMC lawyer if you have any questions about the application of the law of any country, about the Code, or about the relation or any apparent conflict between them.

67.     In a section titled "We Do Not Engage in Insider Trading or Related Unlawful

Conduct," the Code of Conduct provides the following, in relevant part:

> Employees and directors usually may buy or sell the publicly traded securities of FMC and other companies. However, U.S. law prohibits the buying and selling of publicly traded securities by a person with insider information. Even minor violations of the securities laws can have severe consequences. Penalties include forfeiture of gains, civil penalties of up to three times the profit gained or loss avoided, prison terms, and large fines.
>
> Insider trading rules apply to all kinds of securities, including common and preferred stock, bonds, commercial paper, options, and warrants. They apply to direct buying and selling by the individual with knowledge and to tipping off a friend or family member who buys or sells.

68.    In a section titled "We Keep Accurate Company Records and Make Full, Fair, Accurate, Timely, and Understandable Disclosures," the Code of Conduct states as follows:

> We make full, fair, accurate, timely and understandable disclosures in reports that FMC files under applicable laws, rules and regulations and in other public communications. Dishonest reporting, both inside and outside the company will not be tolerated. This includes reporting or organizing information in an attempt to mislead or misinform. No entry will be made on the company's books and records that intentionally hides or disguises the true nature of any transaction.
>
> FMC has adopted controls to ensure the safeguarding of FMC assets and the accuracy of its financial records and reports in accordance with internal needs and requirements of applicable laws and regulations. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All employees, within their area of responsibility, are expected to adhere to these procedures, as directed by the appropriate FMC manager.
>
> No employee or director may interfere with or seek to improperly influence, directly or indirectly, the auditing of FMC's financial records. Violation of these provisions shall result in disciplinary action up to and including termination, and may also subject the violator to substantial civil and criminal liability. If an employee becomes aware of any improper transaction or accounting practice, he or she must immediately report the matter as described in Section 4 of this Code.
> Our obligation to record and report information accurately and honestly also applies to the accurate reporting of time worked, business expenses incurred, research test results and other business-related activities.

69.    In a section titled "We Manage Our Records Properly," the Code of Conduct states that:

To operate effectively and efficiently, records must be managed properly. Documents needed for ongoing business or required by law must be retained, while all other documents should be discarded. If excess records are not discarded, the costs and distraction of records maintenance escalates continually.

Documents should be discarded on an ongoing basis as they are no longer needed, and a general review of documents as to whether they are still needed is to be conducted at least once per year. In general, no document should be retained for more than two years unless it is needed for ongoing business or a law requires its retention. Before disposing of documents, employees and directors should consult FMC's Record Retention Policy on FMC's Intranet. Those who are unsure about the need to keep particular documents should consult with their records administrator or supervisor, so that a judgment can be made as to the likelihood that the documents will be needed. Whenever it becomes apparent that documents will be required in connection with a lawsuit or government investigation, we will preserve all possibly relevant documents and immediately suspend ordinary disposal or modification of documents pertaining to the subjects of the litigation or investigation. Under no circumstances will we alter any of these documents. If we are uncertain whether documents under our control should be preserved because they might relate to a lawsuit or investigation, we will contact the Law Department for guidance.

## AUDIT COMMITTEE CHARTER

70.    FMC also maintains an Audit Committee Charter (the "Charter"), which states that the purpose of the Audit Committee is to: "assist the Board in monitoring (1) the integrity of the financial statements of the Company, (2) the independent auditor's qualifications and independence, (3) the performance of the Company's internal audit function and independent auditor and (4) the compliance by the Company with legal and regulatory requirements."

71.    In a section titled "Authority, Duties, and Responsibilities," the Code of Conduct provide the following, in relevant part:

The Committee has authority to take appropriate actions necessary to discharge its duties and responsibilities, which includes but is not limited to the powers mentioned below.  Among its specific authorities, duties, and responsibilities, the Committee shall:

A.  Review Procedures

1. Meet to review and discuss with management and the independent auditor the

16

annual audited financial statements, including disclosures made in Management's Discussion and Analysis and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

2. Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including disclosures made in Management's Discussion Analysis, and the results of the independent auditor's review of the quarterly financial statements.

\*\*\*

4. Discuss with management the Company's policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and risks related to cyber security; steps management has taken to monitor and control such exposures; and significant estimates affecting the Company's financial statements, such as litigation, tax, and environmental matters.

5. Review with management the Company's earnings press releases, including the use of "pro-forma" or "non-GAAP" information, as well as information and earnings guidance provided to analysts and ratings agencies. Such discussions may be done generally, consisting of discussing the types of information to be disclosed and the types of presentations to be made.

\*\*\*

C. Internal Audit Department

1. Discuss the internal audit plan with the chief audit executive, including the scope, budget and qualifications of the internal audit staff, as deemed necessary.

2. Approve the appointment, performance and replacement of the chief audit executive.

3. Review significant internal audit findings with the chief audit executive, along with management's responses and follow-up to the findings, together with explanations for any significant deviations from the original plan.

D. Compliance and Other Matters

\*\*\*

2. Review and discuss any reports from the Corporate Responsibility Committee, management, internal auditors, and independent auditor regarding the Company's (including its subsidiary/foreign affiliated entities) conformity with applicable legal requirements and the Company's Code of Ethics and Business Conduct Guidelines.

3. Discuss with management and the independent auditor any correspondence with

17

regulators or governmental agencies and any published reports, which raise material issues regarding the Company's financial statements or accounting policies.

***

5. Conduct or authorize investigations into any matters within the Committee's scope of responsibilities.  For that purpose, the Committee shall be empowered to retain independent counsel, accountants, or other advisors to assist in the conduct of such investigations and shall advise the Board as to the nature and extent of such investigations.  The Company shall provide for appropriate funding, as determined by the Committee, for payment of compensation to the independent auditor for the purpose of rendering or issuing an audit report and to any advisors employed by the Committee.

## SUBSTANTIVE ALLEGATIONS

*Background*

72.     FMC is a Delaware corporation that describes itself as "a global agricultural sciences company" and states that it is "the fifth largest global innovator in the agrochemicals/crop protection market."

73.     The Company develops and sells crop protection products, including insecticides, herbicides, fungicides and seed treatments.

74.     FMC divides its operations into four major regions: North America, Latin America ("LATAM"), Asia-Pacific ("APAC"), and Europe, the Middle East, and Africa ("EMEA").

75.     In 2017, the Company acquired two diamide insecticides, Rynaxypyr and Cyazypyr, from DuPont for $1.2 billion. The acquisition of Rynaxypyr and Cyazypyr included several related patents related, including: (i) Composition of Matter Patents, which "[p]rotect[ed] [the] proprietary molecular structure of the active ingredient and the molecular structure of certain intermediates"; (ii) Process Patents, which "[p]rotect[ed] the manufacturing processes for the active ingredient and the key intermediates used to make the active ingredient"; (iii) Formulation patents, which "[p]rotect[ed] product formulations that use[d] the active ingredient"; (iv) Use

18

Patents, which "[p]rotect[ed] how a product containing the active ingredient [was] used"; and (v) Application Patents, which "[p]rotect[ed] the methods or approaches to apply products containing the active ingredient."

76.    The Company primarily sells Rynaxypyr and Cyazypyr directly to authorized distributors. The Company thus maintains long-standing relationships with many of its distributors, some of whom the Company has worked with for over twenty-five years and with whom the Company has pre-payment agreements to guarantee continuous supplies of inventory. This arrangement provides the Company with extensive insight into the inventory levels maintained by its distributors.

77.    During the Relevant Period, in order to secure financing, FMC entered into credit agreements that required the Company to maintain specific leverage ratios to avoid default. For instance, on May 26, 2021, the Company entered into a Fourth Amended and Restated Credit Agreement (the "Fourth Credit Agreement"), which provided for a "$1.5 billion revolving credit facility . . . with an option, subject to certain conditions and limitations, to increase the aggregate amount of the revolving credit commitments to $2.25 billion" and required to the Company to maintain a leverage ratio of not more than 3.75:1.00 as of the end of each fiscal quarter until September 30, 2021, thereafter mandating a leverage ratio of 3.50:1.00.

78.    On June 17, 2022, the Company entered into a Fifth Amended and Restated Credit Agreement (the "Fifth Credit Agreement"), which provided for a $2.0 billion to $2.75 billion revolving credit facility and required the Company to maintain a leverage ratio of not more than 3.50:1.00.

79.    As reported by numerous former employees, FMC implemented and maintained a SAP program for Enterprise Resource Planning ("ERP"), which provided Company-wide access

to data pertaining to all facets of FMC's business. For instance, FE 8 characterized the Company's SAP ERP system as "cutting edge," providing "instant access to information" pertaining to, *inter alia*, sales, forecasting, inventory, and pricing across all of FMC's global operations.

***Destocking and the Collapse in Demand for the Company's Products***

80.      During the COVID-19 pandemic, demand for the Company's products was temporarily heightened, as distributors, retailers, and consumers amassed large volumes of excess inventory to prepare for potential supply chain disruptions. As a result, by 2022, FMC and its competitors saw record high revenues. However, this heavy purchasing activity meant that these distributors also maintained excess inventory. Because the costs of carrying excess inventory had increased and were continuing to rise, these same distributors then reduced their new orders for crop protection products in an attempt to destock their own inventories.

81.      Former FMC employees confirm that the Company's increasing sales during this time period was not an accurate reflection of underlying demand for its products.

82.      For instance, FE 1 recalled distributors procuring "huge volumes" of "excess" inventory in 2021 and early 2022. According to FE 1, the Company failed to account for future losses resulting from excess inventory that would ultimately lead to reduced margins and sales in future periods. FE 1 states that, by mid-2022, inventories of the Company's products were "already exploding," which caused a substantial decline in FMC's margins. For instance, FE 1 stated that, by the end of 2021, the Company's customers began negotiating with FMC to return some of their excess inventory and renegotiating the price they had agreed to pay for that product, in consideration for continuing to buy FMC products.

83.      FEs 6 and 17 similarly stated that many of FMC's customers accumulated excess inventory of FMC products to avoid the implications of supply chain disruptions caused by the

COVID-19 pandemic. According to FE 6, FMC's headquarters encouraged all regions to push for more sales during this time period. FE 6 explained that this created a significant demand "bubble," and that it was understood throughout the Company, including by top management, that this "bubble" would likely not last. FE 6 expressed a belief that the Company's executives were misleading the public during this time period about the sustainability of FMC's revenues.

84.     Likewise, FE 4 recalled FMC's customers purchasing product in excess of expected demand to account for supply chain disruptions and stated that everyone at the Company "always knew that we would hit a wall." FE 4 stated that, despite knowledge that the heightened demand was a temporary result of the COVID-19 pandemic, the Individual Defendants failed to adjust the Company's revenue forecasts for the years that followed. According to FE 4, by the spring of 2022, a decline in the demand for FMC's products was "imminent."

85.     FE 10 stated that FMC's customers were purchasing product two years in advance during the COVID-19 pandemic. FE 10 recalled advising his Regional Business Manager that the sales targets provided to him for 2021 and 2022 were infeasible because "barns were full and product had not hit the ground."

86.     According to FE 5, it was widely understood throughout the Company that overbuying had occurred between 2020 and 2022. FE 5 stated that FMC's inventory issues caused decreased sales in the periods that followed. FE 3 recalled these inventory issues between 2020 and 2022 as well.

87.     FE 11 stated that, when supply chains came to a "screeching halt" during the COVID-19 pandemic, many distributors began purchasing FMC's diamide products as substitutes for other products that became unavailable. According to FE 11, many of FMC's products were more readily accessible during the COVID-19 pandemic, compared to similar products on the

market, because they were manufactured in the United States.

88.     The Company's inventory issues were further confirmed by FEs 9 and 18. For instance, FE 18 recalled a significant decrease in product orders in 2022 and 2023 as FMC's customers drew from excess inventories. FE 9 characterized sales during the pandemic as "unnatural." According to FE 9, distributors, retailers, and farmers began making duplicate orders during the COVID-19 pandemic, placing the same orders from up to five different sources, hoping that just one of those orders could actually be fulfilled. FE 9 stated that all of these orders would be counted as sales, but when a customer received the product it needed from one channel, it would cancel the duplicate orders. According to FE 9, FMC leadership became aware of this trend of double-and-triple ordering through, *inter alia,* direct communication with divisional directors, access to the Company's SAP ERP system, communication with distributors, and other forms of internal reporting.

89.     Former employees, including FEs 2, 3 and 17, confirm that Company management continued to increase sales targets following the COVID-19 pandemic despite knowledge that channels were saturated. FE 3 recalled responding to high sales targets by questioning, "how on earth are we supposed to be selling that much when the channels were already full?" FE 3 stated that the Company maintained unrealistic sales targets across all four regions.

90.     FE 6 similarly recalled FMC management raising sales targets by 10% or more in 2021 over the prior year's COVID-19-inflated sales figures. According to FE 6, many veteran members of the sales team in Pakistan left the Company out of frustration related to unrealistic sales targets.

91.     FE 14 recalled the Company incentivizing distributors to accept unneeded product by offering deals "with no cash needed." FE 14 estimated that FMC had lost $50 to $60 million

due to the practice of pushing sales and specifically stated that Defendants Douglas and Sandifer were aware that pushing higher sales despite saturated channels was adversely impacting FMC's business.

92.    FE 15 recalled visiting distributor and retail warehouses and personally observing inventories that were significantly higher than normal levels. FE 4 stated that the practice of "shov[ing] products into the channel" to meet sales targets was coming from executive leadership, including Defendant Douglas.

93.    According to FE 19, the inventory issues were exacerbated by an anticipated significant price increase in FMC's products, which the Company communicated to customers was planned for December 2022. FE 19 explained that customers pre-bought product prior to the anticipated price increase, causing further accumulation of excess inventory and downward pressure on demand for FMC's products in 2023.

94.    In addition to excess inventory accumulation, other market factors caused downward pressure on demand for FMC's products during and after 2022. For instance, an increase in generic competition for FMC's products, including the Rynaxypyr and Cyazypyr, substantially impacted FMC's sales.

95.    By mid-to-late 2022, the Company had begun experiencing significant and undisclosed legal setbacks that adversely impacted FMC's ability to maintain patent exclusivity for Rynaxypyr and Cyazypyr. For example, on September 12, 2022, the China National Intellectual Property Administration ruled that FMC's process patent for an intermediate chemical used in the production of Rynaxypyr was invalid and unenforceable.

96.    On September 16, 2022, a court in Brazil, the largest market in FMC's LATAM region, ordered three agencies to conduct regulatory assessments of a generic form of Rynaxypyr,

produced by Rainbow Agro, that were required for the product to be marketed and sold in Brazil.

97.     Then, on September 19, 2022, the Delhi High Court in India ruled against FMC in litigation with Natco Pharma ("Natco"), a competitor seeking to manufacture another generic substitute for Rynaxypyr, and vacated an injunction previously obtained by FMC against Natco. Shortly thereafter, Natco announced the launch of its generic competitor, Natgen, in the Indian market. On December 5, 2022, the High Court of Delhi denied FMC's appeal of the September decision.

98.     On November 14, 2022, the Delhi High Court again ruled against FMC and referred to FMC's litigation strategy as "nothing but an attempt by the Plaintiffs to extend their monopoly."

99.     Former FMC employees recall an influx of generic competitors to Rynaxypyr and Cyazypyr in several key markets as early as 2021 or 2022. For example, FE 1 stated that the marketing teams of FMC's distributors attributed reduced orders of FMC products not only to excess inventories but also to a rise in generic competitors that were significantly cheaper than the Company's products.

100.    FE 7 recalled a prevalence of generic competitors in Pakistan, India, and Europe and stated that FMC's business in China had been reduced by as much as 50% as a result of generic competitors.

101.    FE 3 observed a growing number of generic herbicides by 2022, as FMC patents began to expire. FE 10 stated that, during 2022, generic competition reduced FMC's sales in the United States market as well. FE 10 recalled generic substitutes for the Diamide Products appearing in the United States, including Steward and Indoxacarb, and stated that FMC simply could not compete. FE 10 recalled receiving a call from a colleague in Oklahoma who explained that retailers had begun selling a generic competitor that was available for roughly half the price

of FMC's product.

102.    FE 12 recalled Company initiatives to decrease production costs for its Diamide Products to compete with generic competitors in India and China. FE 12 stated that claims that FMC had a strong patent portfolio around the world were "overstated," and that, while some countries had "robust" patent protection, others did not. FE 12 further explained that the Company's process patents were particularly vulnerable in some countries.

103.    FE 4 similarly recalled discussions at FMC regarding concerns over process patents by early 2022 and stated that the Company was "banking a lot on the protection of the process patents" which was "kind of a long shot."

104.    FE 2 explained that the sale of generic competitors in China spread, as once a product can be registered as a generic in one country, the same could be done lawfully in some other places, like Pakistan. FE 2 further stated that companies began testing generic alternatives to Rynaxypyr and Cyazypyr in Pakistan in 2019 or 2020, and by mid-2022, many of these generic competitor products became registered for sale. FE 13 similarly stated that companies in Pakistan began registering generic alternatives to the Diamide Products by 2022. According to FE 14, by 2023, generic alternatives to the Diamide Products entered the market in Pakistan for roughly half the price of FMC's products. FE 14 further noted that FMC was facing similar competition from generics in India.

105.    In addition to the Company's inability to protect its intellectual property, FMC's sales were harmed by substantial industry consolidation in 2021 and 2022 among FMC's distributors. FE 10 explained that the consolidated national distributors began favoring crop protection products offered by FMC's competitors who operated in the larger agricultural market as their herbicides and pesticides could be bundled with other products and sold at a discount. For

instance, whereas FMC only sold crop protection solutions, its competitors like Corteva, Syngenta, and Bayer also sold seed offerings which could be bundled with crop protection products in sales to distributors.

106.    Further, the consolidated distributors were acquiring retailers as well, and many of the distributors began marketing generic alternatives to FMC's products as their own. Accordingly, distributors often had additional economic incentives, and more ability, to push FMC's competitors to retail.

107.    Former employees explain that FMC's demand and revenue issues continued throughout the Relevant Period. FE 10 stated that, while distributors expressed "favoritism" towards FMC's competitors, "no one had the gumption to tell the investors that the party was over."

108.    FE 1 recalled receiving pressure to increase customer credit limits in an effort to increase sales despite channel saturation. According to FE 1, the constant pressure on FMC's customers to take on more product led to declines in the Company's margins that needed "a lot of clean up" in 2023.

109.    FE 6 stated that the overbuying of FMC's products during the COVID-19 pandemic not only led to decreased sales, but to increased customer dissatisfaction and returns. FE 6 explained that many of the products that were purchased in advance, including Rynaxypyr and Cyazypyr, had expiration dates, and by 2022, many customers began to demand that the products be replaced.

110.    FE 19 recalled significant sales shortfalls in the United States and in the EMEA region through 2023. According to FE 9, however, the sales figures being reported by FMC in 2023 were significantly overstated and that "there [was] absolutely no way" that the numbers being

reported were accurate. FE 5 similarly recalled that FMC was "not meeting the [sales] numbers" in the LATAM region in 2023.

111.    Former employees recall indications that the Company was struggling financially by mid-2022 and into 2023. For instance, FE 4 recalled the Company cutting its advertising budget and beginning layoffs in mid-2022. FE 10 recalled the Company inducing employees to take voluntary separation in the fall of 2023 by threatening layoffs. FE 9 similarly recalled the Company beginning to offer early retirement to employees in 2023.

***Former Employees Confirm that the Individual Defendants Knew About FMC's Declining Demand***

112.    Several former employees explained that detailed information concerning the Company's demand, channel inventories, revenues, margins, and pricing was widely accessible throughout the Company and flowed from the regional level up to Company management in the United States.

113.    FE 1 recalled regularly participating in Supply and Operations (S&OP) meetings, at which the Company's sales, distribution channels, demand, and inventories were discussed. According to FE 1, through at least mid-2022, LATAM S&OP meetings occurred monthly and Company-wide S&OP meetings occurred twice per year. FE 1 explained that the Company's senior regional executives attended the monthly S&OP meetings, including LATAM President Ronald Pereira and LATAM CFO William Mills.

114.    FE 19 similarly reported that, through mid-2023, there were monthly S&OP meetings in the EMEA region, at which the VP for Europe, finance managers, demand managers, and supply chain managers, among others, were present. FE 19 also stated that Defendant Douglas participated in monthly Executive Sales and Operations Planning ("ESOP") along with all of the Company's VPs. FE 19 explained that, during September of each year, sales numbers were

27

presented as part of a budget presentation by the VP of Europe to Defendants Douglas and Sandifer.

115.    FE 3 detailed monthly Demand Planning meetings in FMC's EMEA region, at which personnel from numerous Company departments were present. FMC's demand plans accounted for information concerning the demand for the Company's products, inventories in distribution channels, and supply issues. According to FE 3, following the monthly EMEA Demand Planning meetings, the European Head would then meet with Defendant Douglas.

116.    FE 4 recalled "All Hands" meetings, which took place at FMC's headquarters in Philadelphia, Pennsylvania approximately one month after the end of each fiscal quarter. FE 4 explained that Defendant Douglas led these meetings, at which various topics were discussed, including the Company's quarterly performance, inventory levels, sustainability, and market factors impacting FMC's business.

117.    FE 16 stated that he learned about FMC's inventory issues in Brazil at "Town Hall" meetings, at which Defendants Douglas and Sandifer spoke. Despite discussions of the Company's inventory issues, FE 16 recalled Company management touting how much its business was growing during these meetings. FE 16 stated that he "laughed about the numbers the Company put out" in these meetings, and "no one" in his position "believed anything they said in the Town Hall meetings because they were not accurate numbers at all."

118.    FE 1 stated that LATAM CFO William Mills and other regional leaders reported deterioration in product pricing up to Defendants Douglas and Sandifer on a quarterly basis. FE 1 further explained that through at least mid-2022, the Company was able to monitor distributors' inventory levels, as FMC had employees "on the ground" to track monthly inventory levels, and FMC's distributors either had computer systems that were integrated with FMC's systems or sent

inventory reports to the Company. Likewise, FE 3 explained that FMC's distributors in Germany shared inventory information with FMC.

119.    FEs 9 and 10 explained that the Company's SAP ERP system contained detailed information regarding distributor orders, and FE 9 stated that the Company utilized Point of Service reports, in which retailers reported inventory information to FMC.

120.    Former employees further detailed the use of Electronic Distribution Invoice ("EDI") reports by FMC, which contained detailed information pertaining to the supply chain of the Company's products, from distributor to retailer. FEs 9 and 15 confirm that EDI information was reported to FMC Corporate.

***Project Focus***

121.    Illustrating the extent of the revenue slowdown, on October 23, 2023, the Company reported a twenty-nine percent year-over-year decline in revenue for 2023's third quarter because of "channel destocking in all regions."

122.    In response, the Company implemented a global strategic restructuring plan named "Project Focus." Project Focus aimed to "right- size [FMC's] cost base and optimize [FMC's] footprint and organizational structure with a focus on driving significant cost improvement and productivity." The Company represented to investors at all relevant times that Project Focus would result in massive cost savings and increased future profits for the Company.

***False and Misleading Statements Issued During the Relevant Period***

123.    On February 8, 2022, FMC issued a press release (the "February 2022 Press Release") announcing the Company's financial results for the fourth quarter of 2021. The February 2022 Press Release reported "record quarter results," driven by "strong demand and pricing actions." The February 2022 Press Release further highlighted "new products and

continued market expansion of Rynaxypyr and Cyazypyr" and quoted Defendant Douglas as stating that the Company's financial results "reflect[] the strength of our synthetic and biological portfolios, a healthy demand environment as well as accelerating price increases." Defendant Douglas further represented that "Revenue growth was particularly robust in North America and Latin America."

124.    During a related earnings call with investors and analysts, Defendant Douglas stated that "[o]ur Asia business is expected to grow across several countries driven by diamides, new products and biologicals. India will continue to be an important market for our diamides as well as the broader portfolio, especially in sugarcane, rice and specialty crops."

125.    In response to a question regarding "channel inventories," Defendant Douglas stated the following:

> From a volume perspective . . . there's obviously—there's very, very strong demand out there.
>
> * * *
>
> I think from a market demand perspective, it's very strong all over the world. I mean when I think about channel inventories today, frankly, I have very, very few concerns from where I sit at FMC. There are pockets in India following the spotty monsoon that we had last year, but they're not significant. Brazil, we have— from FMC's perspective, we got absolutely 0 concern. From North America and probably the other way around when it comes to channel inventories, I'm more concerned that there is not enough material there. Europe, not really a problem at all. So channel inventories, frankly, in our own internal conversations has not really come up much in the last quarter. Demand has come up. Demand is very, very strong.

126.    During the same call, in response to a question regarding the Company's growth expectations, specifically with respect to Rynaxypyr and Cyazypyr, Defendant Douglas stated:

> I think what is most pleasing for us is we see the diamides continuing to grow in that mid- to high single-digits depending on the year, that keeps rolling through. We see that year in, year out since we acquired the products.

127.    On February 25, 2022, the Company filed an annual report on Form 10-K with the SEC (the "2021 Form 10-K"). The 2021 Form 10-K was signed by Defendants Sandifer, Brondeau, Douglas, Cordeiro, Davidson, Greer, Johnson, Kempthorne, Norris, Øvrum, Pallash, and Volpe and contained the following warning regarding the risks related to competition:

> Our business faces competition, which could affect our ability to maintain or raise prices, successfully enter certain markets or retain our market position. Competition for our business includes not only generic suppliers of the same pesticidal active ingredients but also alternative proprietary pesticide chemistries and crop protection technologies that are bred into or applied onto seeds. Increased generic presence in agricultural chemical markets has been driven by the number of significant product patents and product data protections that have expired in the last decade, and this trend is expected to continue. At this time, the scope and potential impact of these technologies are largely unknown but could have the potential to disrupt our business.

128.    This generic risk disclosure was materially misleading because it represented as merely hypothetical a risk that had already materialized. Specifically, competition was already affecting the Company's "ability to maintain or raise prices" or to "retain [] market position."

129.    The 2021 Form 10-K also contained the following risk disclosures related to the Company's ability to protect its intellectual property:

> Our future performance will depend on our ability to address active ingredient composition of matter patent expirations through effective enforcement of our patents that continue to cover key chemical intermediates and process patents, as well as portfolio life cycle management, particularly for our high value diamide insecticides . . . Some of our competitors may secure patents on production methods or uses of products that may limit our ability to compete cost-effectively.
>
> * * *
>
> The composition of matter patents on our Rynaxypyr® active ingredient is nearing its expiration in several key countries. We have a broad estate of additional patents regarding the production of Rynaxypyr® active ingredient, as well as trademark and data exclusivity protection in certain countries that extend well beyond the active ingredient composition of matter patents. Other third parties may seek to enter markets with infringing products or may find alternative production methods that avoid infringement or we may not be successful in litigating to enforce our patents due to the risks inherent in any litigation. . . . . We are currently and may in

the future be a party to various lawsuits or administrative proceedings involving our patents. (See "Patents, Trademarks and Licenses" in Item 1.). Such challenges can result in some or all of the claims of the asserted patent being invalidated or deemed unenforceable. In such circumstances, an adverse patent enforcement decision which could lead to the entry of competing chlorantraniliprole products in relevant markets may materially and adversely impact our financial results.

130.    On March 8, 2022 Defendant Douglas participated in the RBC Capital Markets Chemicals and Packaging Conference. During his presentation, Defendant Douglas stated that "[c]hannel inventories for us are normal, if not low in some parts of Latin America." Defendant Douglas further stated:

> We've had very strong demand. A lot of that demand was used during the season, which is always a very good sign. So I think with soft commodity prices as they are, you're going to see that trend pretty much everywhere in the world where products are getting used to make sure that the growers are getting the highest yields they possibly can. When you have record prices for soy, corn, wheat and you name your crop, cotton, sugar, they're all up there. People really want to protect those crops. So we see that demand side being very strong.

131.    On May 3, 2022, the Company filed a quarterly report on Form 10-Q with the SEC ("the 1Q22 Form 10-Q"). The 1Q22 Form 10-Q incorporated by reference the materially misleading risk disclosures regarding increased competition and the Company's ability to protect its intellectual property that were contained in the 2021 10-K.

132.    The same day, the Company hosted a related earnings call. During the call, Defendant Douglas was asked about the Company's channel inventories and the "good amount of prebuying in a lot of different regions ahead of maybe an expectation of additional price increases, concerns around supply chain." In response, Defendant Douglas stated:

> Generally speaking, we are not concerned about channel inventories. There are a couple of pockets in the world. One we alluded to, which is India. In Q4, weather patterns were not great, and there is a reduction in rice acres in India, and you saw some of the comments about strong growth in ASEAN and Australia offset by India. We're taking the opportunity to reduce our channel inventories in India at the beginning of the year. We expect that to normalize pretty quickly as we go through the first half year. Outside of that, Northern Hemisphere, I don't think we'll

carry in excess inventories as we're going into the channel into the seasons.

* * *

So we're not seeing anything that we would say is concerning at all. They seem pretty normal to us. In Latin America, for us, normal. Argentina, Brazil, Mexico, India where we should be at this point of the season, demand has been very good for us. Our growth rates are in line with how we're penetrating the market. You'll recall on the call here, I just talked about the fact that we've been spending a lot of time and effort improving our market access into the soy complex in Brazil, and that's where our growth is coming from, whether it be with insecticides or some of the new herbicides that we have in place. We're not worried about where our inventory levels are at all in Brazil or Argentina.

133.    During the same call, Defendant Douglas was asked "if you could talk a little bit about, I guess, volumes including mix, so really intensity of use. Are there reasons why you would not expect the higher intensity of use, more spraying[?]" In response, Defendant Douglas stated:

[O]ur backdrop is positive. [W]e believe markets will continue like this, certainly this year and probably into next year as well. We don't see anything on the horizon that will change that. So from our perspective, it is making sure that we can get those high-quality, newer technologies to the marketplace, certainly in the right time frame given all the disruptions we're seeing.

134.    On May 4, 2022, Defendant Sandifer participated in the Wells Fargo Industrial Conference, during which he was asked about demand for the Company's products in the United States. Defendant Sandifer provided the following response:

The U.S.—look, the U.S. market is still going gangbusters. We'll see how planning continues to proceed in early season, but it's been a good start to the season. We had very robust sales growth in both Canada and the United States in the first quarter, and it is one place that I would know we definitely saw some advanced purchasing, all within the season for products that should be used within this growing season, but that blurring between Q2 and Q1.

135.    During the same presentation, Defendant Sandifer acknowledged that such demand was atypical for the season, but stated that the Company nevertheless expected to sustain that level of demand "for several years":

Certainly, there were heightened concerns among retailers, distributors and growers

on availability of materials. So we did see some early plays in the orders, and quite honestly, we had a very, very strong Q1. We could have sold more, but we ended up with more demand particularly for products that aren't quite -- it's not quite the time for them to usually be consumed that we weren't prepared to produce just yet. That demand has been very, very strong. We see those conditions continuing. . . . And we see a pretty good market in the U.S., not only for this year but for several years.

136.    On May 18, 2022, Defendant Douglas participated in the BMO Capital Markets Global Farm to Market Conference, during which he was asked a question regarding the Company's channel inventory position. Defendant Douglas provided the following response:

[I]nventories are where they should be right now. We had a very -- FMC had a very strong Q1, but we know some of that came from Q2 because people are just concerned about supply. Rightly so with what's happening in the chemical industry and the broader industry in general. I think inventories are in good shape. The only one we highlighted at our February call, which we're working through now, is parts of India. There was less rice acres given the seasonal weather, the monsoon in Q4. So we had more inventory as FMC, and I'm sure others did as well, but everywhere else is in pretty good shape.

137.    During the same conference, an analyst noted that the Company had lacked visibility into inventories in the past, particularly in Brazil. When asked what the Company was doing differently, Defendant Douglas stated:

Today, we have a system that is very different. We manage inventory not only in our own facilities, not only in third-party warehouses but also at the grower level. So our sales force and our financial groups are actually lockstep in terms of how much product are we selling into the market? How much is actually getting through to the grower? And then importantly, how much is getting used on the ground? So the system is completely different to what it was 7, 8, 9 years ago in terms of how we manage inventory in Brazil.

138.    Defendant Douglas continued, adding that "right now, as I said earlier, there are no issues with inventory in Brazil for us."

139.    In response to a question regarding the Company's EBITDA and revenue targets, Defendant Douglas stated:

I mean we put our plan together back in 2018 after we acquired the DuPont assets,

and we had really an algorithm that said 5% to 7% top line growth, 7% to 9% EBITDA growth and then EPS growing faster than EBITDA. We're generally on - - we're right the range for revenue. We're slightly below in terms of EBITDA, but we've had $1 billion of costs and FX that we didn't have in the plan. So I feel very good where the company is. I think this year, we're at 6% EBITDA growth. So we're right at the range. It's a very attractive algorithm. When you think of a company like us, $5.5 billion in revenue, $1.4 billion in EBITDA, we're in a $65 billion market. We're a research company. We're applying 6% to 7% of our revenue into that model for R&D. You should be growing your EBITDA faster. And we have been. So I think that model is very much intact.

140.    Later during the conference, Defendant Douglas touted the Company's "very strong demand," stating:

We're managing through a very volatile environment. We all know that. That will change as we go through the rest of the year and into next year, that should change. But the way the company is performing, dealing with all the activities that are out there, very strong demand, pricing actions where we delivered 8% price in the quarter, roughly mid-single-digits for the full year to offset costs. I think the company is performing at a very high level. So we were surprised when we saw the stock go down. It's come back, not quite to the point that it was. But I think people are missing the fact that the company is performing at a high level. We have 26%, 27% EBITDA margins. There is nobody in the industry growing at 7% to 8% on the revenue line with those sort of EBITDA margins, despite the significant cost inflation that we've got.

141.    On August 3, 2022, FMC filed a quarterly report on Form 10-Q with the SEC (the "2Q22 Form 10-Q") which incorporated by reference the misleading risk disclosures regarding increased competition and the Company's ability to protect its intellectual property that were contained in the 2021 Form 10-K and the 1Q22 Form 10-Q.

142.    The same day, FMC hosted a related earnings call, during which Defendant Douglas stated the following in response to a question regarding the Company's inventory levels:

We're very okay with inventory levels pretty much everywhere in the world right now. I would say the only spot and I've commented on this at the last earnings call is there has been a significant reduction in rice acres in India. And we're working through inventory in India. That will be done as we go through the second half of the year. Everywhere else, frankly speaking, is very good from our perspective on inventory. So we're not worried about that going into the end of the year.

143.    During the same call, Defendant Douglas was questioned regarding revenue streams from Rynaxypyr and Cyzypyr coming from FMC-branded products versus FMC's third-party partners. In response, Defendant Douglas stated that 60% of the revenue came from FMC-branded products. Defendant Douglas continued, stating:

> I think the most important takeaway that you should take away from this conversation is the 40% as it grows, does not take away from the 60% as we grow. It's an expansion of the market pool for the diamides . . . we see the diamides taking share from a number of older chemistries, whether they be neonicotinoids, some of the pyrethroids, and certainly some of the [carbonates] around the world.

144.    On November 1, 2022, FMC issued a press release (the "November 2022 Press Release") announcing the Company's financial results for the third quarter of 2022. The November 2022 Press Release quoted Defendant Douglas as stating that "FMC's strong growth continued in the third quarter driven by a robust start to the Latin American season and continued pricing actions across all regions." Regarding the Company's LATAM segment, the Company reported that regional sales "grew 35 percent year-over-year driven by strong herbicide and insecticide demand" and that, "In Brazil, FMC is reaping the benefits of investing in expanding market access for its products."

145.    During a related earnings call the next day, November 2, 2022, Defendant Douglas represented that "demand remains strong for new products based on the diamides and other chemistries, and FMC continues to make significant progress by improving our market access in geographies where we are underrepresented." Defendant Douglas continued, stating:

> Pricing momentum and volume growth are expected to more than offset FX headwinds in the quarter. We have good visibility into demand for the quarter with strong order books for both the Brazilian and US markets. Cost increases are forecasted to be lower in Q4 compared to Q3. The combination of sales growth and lower cost headwinds is anticipated to result in EBITDA growth of 15% at the midpoint with EPS up 9% at the midpoint year-over-year.

146.    During the same call, in response to a question regarding growth rates for

Rynaxypyr and Cyazypyr, Defendant Douglas stated "[t]his year, year-to-date, we're up in the high mid-single digits. We would expect that same growth rate next year as we go forward. We're getting new registrations, especially for Cyazypyr. That market is growing rapidly in many parts of the world, which is good news."

147.    Defendant Douglas was then asked about the Company's inventory levels. In response, Defendant Douglas represented that higher inventories were limited to "pockets", rather than Company-wide. Further, Defendant Douglas attributed the "pockets" of higher inventories to weather conditions and maintained that "generally speaking, overall, we would say we're happy where inventory levels are":

> Well, I think generally speaking, overall, we would say we're happy where inventory levels are in the marketplace. There are pockets of higher inventories. We talked about India before. The last few years, with the weather monsoons played out and rice acreage reductions, have not been great. So we're working through inventory there.

> I would say in the U.S., things are fine. Europe is pretty okay for us. 1 or 2 pockets in the South because of the dry weather that we had last year. I would say in Latin America, there are parts of Brazilian market where they had a drought last year that you can imagine inventories are high. Inventories are high right now in Brazil because we're in the planting season. But we're happy with where our inventories are right now.

148.    Also on November 2, 2022, FMC filed a quarterly report on Form 10-Q with the SEC (the "3Q22 Form 10-Q"). The 3Q22 Form 10-Q incorporated by reference the misleading risk disclosure related to increased competition that was included in the 2021 Form 10-K and the Company's previously filed quarterly reports.

149.    The 3Q22 Form 10-Q also included the following risk disclosure related to the Company's ability to protect its intellectual property, specifically mentioning FMC's patent litigation in China and representing that "we do not believe that the China Patent Review Board's decisions would materially adversely impact our enforcement of similar patents in other

countries":

> The composition of matter patents on our Rynaxypyr® active ingredient are nearing their expiration in several key countries. We have a broad estate of additional patents regarding the production of Rynaxypyr® active ingredient, as well as trademark and data exclusivity protection in certain countries that extend well beyond the active ingredient composition of matter patents. We intend to strategically and vigorously enforce our patents and other forms of intellectual property and have done so already against several third parties. Other third parties may seek to enter markets with infringing products or may find alternative production methods that avoid infringement or we may not be successful in litigating to enforce our patents due to the risks inherent in any litigation. We are currently and may in the future be a party to various lawsuits or administrative proceedings involving our patents. Such challenges can result in some or all of the claims of the asserted patent being invalidated or deemed unenforceable. Two such proceedings in China are currently on appeal. In such circumstances, an adverse patent enforcement decision which could lead to the entry of competing chlorantraniliprole products in relevant markets may materially and adversely impact our financial results.

* * *

> As noted in our 2021 Form 10-K, in early 2022, we received notice that certain third parties were seeking to invalidate our Chinese patents on a certain intermediate involved in producing chlorantraniliprole and a process to produce chlorantraniliprole; we intend to defend vigorously the validity of both patents. During the third quarter of 2022, the China Patent Review Board issued rulings which held that the two challenged patents were not valid in China. We believe the Review Board's decisions are seriously flawed both on procedural and substantive ground and we have filed appeals. Under Chinese law, the patents remain valid but are not enforceable pending appeal. Given the unique and specific Chinese patent law issues at issue in that situation, we do not believe that the China Patent Review Board's decisions would materially adversely impact our enforcement of similar patents in other countries.

> The composition of matter patent that covers chlorantraniliprole (also known as Rynaxypyr® active) expired in a number of countries in August 2022; this patent will continue to remain in force in other countries throughout the world, expiring on a country-by-country basis at various dates through 2027. As described in our 2021 Form 10-K, we are deploying a multi-pronged strategy to defend that business after active ingredient patent expiration, including enforcement of our patents in many countries which continue to cover chemical intermediates and manufacturing processes that are essential in the production of chlorantraniliprole.

150.    On November 8, 2022, Defendant Sandifer participated in the Morgan Stanley

Global Chemicals, Agriculture and Packaging Conference, during which he stated:

> We're also growing really rapidly. At the midpoint of our guidance for the full year, we're growing 13% in sales. We raised our guidance $100 million for revenue for the full year for essentially for the fourth quarter. Similarly, as we've discussed, we're expecting a pretty robust demand environment going into next year. So we're actually building inventory slightly in addition to dealing with just the inflationary impact on inventory values. But we're actually building and maintaining inventory despite the higher sales so that we're well prepared to go into Q1 and early Q2 with material.

151. During the same conference, Defendant Sandifer stated the following regarding the

Company's ability to meet its long-term growth targets:

> We sketched out -- we're going into the fifth year of our 5-year plan, the 5-year strategic plan we launched in 2018 after digesting the acquisition of the DuPont assets. First time in my career in the chemical industry, we've made it to the 5th year of a 5-year plan. So I think that says something about the strength of the platform despite all the volatility that we've seen in the world in the last several years. But we're very excited about the ability to continue growing at a market -- above market level. So we could use that same range at 5% to 7% top-line growth as a guidepost, which would be a significant premium to the overall market. And that's driven by both volume and pricing.

> \* \* \*

> I think from a profit perspective, we're also very optimistic and particularly looking to return to our expectations of the bottom line growing substantially faster than the top line. In our long-range plan, we had this algorithm, if you will, of growing the top line 5% to 7% and growing the bottom line 7% to 9%. And we think that's kind of a range that's well within reach for 2023 for the company.

152. On February 7, 2023, FMC issued a press release (the "February 2023 Press

Release"), announcing the Company's financial results for the fourth quarter and full 2022 fiscal

year. Therein, FMC reported revenues of $5.8 billion, "reflecting 15 percent growth," Adjusted

EBITDA of $1.407 billion, and Free Cash Flow of $514 million and attributed its "record fourth

quarter and full-year 2022 results" to "robust volume and strong pricing." The February 2023 Press

Release quoted Defendant Douglas as stating that "FMC delivered record performance in the

fourth quarter, driven by robust volume growth, continued strong pricing actions as well as growth

of new products." Defendant Douglas further stated that "North America delivered exceptional revenue growth, with Latin America and Europe, Middle East and Africa (EMEA) posting strong gains."

153.    The February 2022 Press Release also quoted Defendant Douglas as stating the following:

> Full-year results were driven by significant volume and price gains in every region. Our continued focus on new product development, commercial launches and market access investments delivered record results in 2022. More than $600 million in revenue was from new products introduced in the last five years, an increase of over 50 percent from the prior year, and approximately $100 million in revenue from launches in 2022.

154.    Regarding the Company's 2023 outlook, the February 2022 Press Release stated that "full- year 2023 revenue is forecasted to be in the range of $6.08 billion to $6.22 billion, representing an increase of 6 percent at the midpoint versus 2022, driven by strong pricing in all regions and growth in volume driven by new launches and market access." The press release further stated that the "2023 outlook reflects pricing momentum and robust demand."

155.    On February 8, 2023, the Company hosted a related earnings call, during which Defendant Douglas was asked about the Company's inventory levels in the U.S., Brazil, and Argentina. Defendant Douglas provided the following response:

> Yes. I think -- so from a North American perspective, U.S. in particular, I think channel inventories are a little bit elevated right now, but that's normal. I would say, as you enter the season, most of retail and distribution is stocked up for a very good year. When I think of inventory levels for FMC compared to our sales on a percent basis, we're about the same place we were the year before. So I think it's pretty normal.
>
> Brazil and Argentina, a different story. Forget the nonselective that we just talked about. I think because of the conditions that we saw in the south of Brazil and in Argentina, it was very dry in the fourth quarter. I have no doubt that there is elevated channel inventories in that area, would not be a surprise at all.
>
> If I run around the rest of the world, Europe, South of Europe is high again because

of hangover from the last season. Northern Europe is pretty much okay, I think. In Asia, we've talked about India in the past. The weather didn't help again in 2022. So we see high channel inventories in India, which we'll be working through. Parts of Indonesia are similar, somewhat high. Rest of Asia is good. So overall, it's pretty much what you would expect.

156.    During the same call, in response to a question regarding growth expectations for Rynaxypyr and Cyazypyr over the next few years, Defendant Douglas stated:

> I think we've said in the past, sort of that mid-to high single digits is where we think it will pan out over time. I wouldn't change that view right now. We do continue to launch new diamide formulations around the world, and Cyazypyr is growing very nicely as we get the new registration. So I think the mid-to high single digit is a perfectly good range of legacy.

157.    On February 21, 2023, Defendant Sandifer participated in the Citi Global Industrial Tech and Mobility Conference, during which Defendant Sandifer was asked about "patent expirations on diamides . . . and what [you can] do to extend a life." Defendant Sandifer responded as follows:

> [J]ust to give you the big picture, the diamides, Rynaxypyr and Cyazypyr, we have 30 patent families include about 1,000 patents, both granted and applied for that cover [a] broad array of issues that protect the diamides. The one that gets the most initial focus is the composition of matter patents, is literally the patent on the molecule itself. Some of those patents have already started to expire for Rynaxypyr. In fact, in several countries, China, India and certain Eastern European countries, the patent for Rynaxypyr expired in 2022.
>
> Now, that's just one of a small part of the total layer of protections we have around these molecules. We also have patents on the manufacturing process to make Rynaxypyr and Cyazypyr. We have patents on the intermediates, the composition amount of patterns on the intermediate materials that are used in that process. So for example, for Rynaxypyr, it's a 16-stage synthesis process.
>
> Many of the intermediate steps and the chemicals that are produced there really have no other use than for making Rynaxypyr. We have patents on their composition of matter. We have patents on the process to make several of those as well. We also have patents on formulations on how that product is finally formulated to take to market. So we've had this broad set of patent protections. We are also provided some protection to the use of our regulatory data and the way registrations are managed in different countries. They give us protection that continues well until the end of this decade and, in some cases, a bit longer.

And certainly, with -- speaking directly to Rynaxypyr, which has earlier expiration dates, Cyazypyr goes a little bit further. But as you pointed to, P.J., it's not just relying on the patents themselves. And obviously, we've been very aggressive in enforcing the patents. We have won cases for infringement in both China and India and continue to aggressively defend our patents. But we've also engaged partners and brought other people in the business ahead of any kind of patent expiration. We don't believe that in our industry, in crop protection, that there really is a patent cliff. It's more of a long plateau as you transition from being a fully- patented to a post-patented life.

158.    During the same conference, Defendant Sandifer stated the following regarding the

Company's inventory levels:

Yes. I mean, certainly, when we talk about inventories, a lot of the focus is on the inventory that's in the channel so downstream from us and our direct customers, whether that be distributors or retailers or growers depending on the market that we're in. Going around the world, let's say, we'll start with Latin America because I think you highlighted one of the hot points. There was a drought and very dry conditions in Southern Brazil and Argentina at the beginning of the growing season in October, November. Some acreage was pulled out of production. There is some lost volume there. So because of that, there is a bit of channel inventory, and something we're very conscious of and managing closely. I would say there has been improvement in precipitation over the past months. Some of that business is just lost. You're not going to pick it back up. Some of it may recover.

Rest of Brazil is actually in pretty good shape. So it's really the southern part of Brazil and Argentina that are the hotspot. When I look at the rest of the Americas, the U.S. market and Canada, Canada is still a little early. In the U.S. market, there is a lot of product in the channel because there should be a lot of product in the channel. Planning season starts here in another 4 weeks or so. You need that product in place. So for example, preemergent herbicides, which are an important product line for us. You put those now at or before planting. That's the -- now is the time to have that product in the channel. So I think, from our own estimation and analysis, that levels of channel inventory are in line with the level of sales we've been having.

Going around the rest of the world, in Asia, we marked on the call and our most recent earning call highlighted in India. India is another place where we have a little bit of a backup of channel inventory. We have 3 years in a row of sort of uneven or weak monsoons. And I'm not a weather forecaster. I just -- I do know that at some point you revert to me whether that's this year or next year. We went through a similar issue with Australia several years ago. We had a number of years of really pronounced drought. Now they've sort of reversed the threat, and it's a bit of flooding. So I think, this year, India, which is our third largest country, is not likely

42

to be a big contributor to growth as we try to manage through that channel inventory.

Europe, generally speaking, pretty good shape. There's a few spots in Southern Europe where there's some pretty hot and dry weather last year. There's a little bit of inventory in the channel, but it's not significant.

159.    Defendant Sandifer was then asked whether he was "concerned overall" about "some pockets" of heightened inventory. Defendant Sandifer responded, stating, "No. No, I think we're managing. I think we know where the issues are, and we're going to manage it proactively."

160.    On February 24, 2023, FMC filed an annual report on Form 10-K with the SEC (the "2022 Form 10-K"). The 2022 Form 10-K was signed by Defendants Sandifer, Brondeau, Douglas, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Norris, Øvrum, Pallash, and Volpe. The 2022 Form 10-K included the same misleading risk disclosures regarding increased competition and the Company's ability to protect its intellectual property that were contained in the 2021 Form 10-K.

161.    With respect to the Company's patents, the 2022 Form 10-K stated the following:

During 2022, we initiated proceedings to enforce several of our patents and trademarks against generic producers and infringers, resulting in multiple favorable judgments and settlements, including in India and China. In early 2022, we received notice that certain third parties are seeking to invalidate our Chinese patents on a certain intermediate involved in producing chlorantraniliprole and a process to produce chlorantraniliprole; we intend to defend vigorously the validity of both patents. During the third quarter of 2022, the China Patent Review Board issued rulings which held that the two challenged patents were not valid in China. We believe the Review Board's decisions are seriously flawed both on procedural and substantive ground and we have filed appeals. Under Chinese law, the patents remain valid but are not enforceable pending appeal. Given the unique and specific Chinese patent laws and legal procedures at issue in that situation, we do not believe that the China Patent Review Board's decisions would materially impact our enforcement of similar patents in other countries. Patent challenges in response to enforcement efforts is expected as an ordinary defense tactic in patent enforcement cases, and have been raised in several of our enforcement cases to date; we intend to defend vigorously any diamide patents that are challenged. While we believe that the invalidity or loss of any particular patent, trademark or license after appeal would be an unlikely possibility, our patent and trademark estate related to our

diamide insect control products based on Rynaxypyr® and Cyazypyr® active ingredients in the aggregate are of material importance to our operations.

162.    On March 1, 2023, Defendant Douglas participated in the Bank of America Global Agriculture and Materials Conference, during which he was asked about regarding "the patent expiry outlook over the next couple of years" for Rynaxypyr and Cyazypyr. Defendant Douglas provided the following response:

> Listen, we've talked about the diamides a lot, obviously. We get a lot of questions about the patent estate. The patent estate is a matrix of just over 1,000 patents for the 2 molecules. The base composition of matter patents for Rynaxypyr started to come off last August. In some countries, we have runway in others. Same thing for Cyazypyr, which is the smaller molecule, the initial ones start to come off in August 2023 this year and again, spread out after that.
>
> There are also significant patents related to the whole process of manufacturing. These molecules are 15 or 16 synthetic steps, and we have many of those steps patented. I think it's worth noting today that the only legal material that's available is from FMC, even though the original patent has come off. Why is that? Because of the strength of the rest of the patent portfolio.
>
> So we already have a strong network out there of people who are selling diamides, so in some cases, competing with us in different markets, in many cases, expanding the market by having routes to market or formulations that we don't have. That was the intent of the plan. That's what we're seeing today. So we expect the diamide growth to continue.
>
> Last year, diamides grew about 7%. I think in the mid- to long term, you're going to see them continue to grow in the mid-single digit. I think that's an important part of the algorithm of growth. They have been around for almost 20 years now. So that we talk about them as being new molecules, new technology, and they are, but they're coming off the end of their patent. And you should expect at some point towards the end of this decade, you will see generic manufacturing. That is what happens. So we're ready for that. We anticipated and we'll continue to invest in the diamides.

163.    Then, in response to a question regarding the Company's patent litigation in India, Defendant Douglas stated:

> There's a couple of cases in India that we recently won, a couple of cases in China as well. It's interesting when we bought the assets in 2018, there was already illegal material being sold in China, way back in 2018. That continues today. It's

unfortunately a facet of the Chinese industry that many companies will not respect patents, and they go and make [il]legal materials. So it's not as if we're not used to competing with products out there that are of inferior quality but they are illegal, and we will enforce our patents all over the world.

164.    On March 10, 2023, FMC filed a proxy statement on Schedule 14A with the SEC (the "2023 Proxy"). The 2023 Proxy was solicited by Defendants Sandifer, Brondeau, Douglas, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Volpe and called for shareholder to vote to approve: (1) the reelection of Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, and Pallash to the Board; and (2) the compensation of the Company's executive officers.

165.    Regarding FMC's Code of Conduct, the 2023 Proxy provided:

The Company has a Code of Ethics and Business Conduct that applies to all directors, officers (including its Chief Executive Officer, Chief Financial Officer and Controller) and employees. It is posted on the Investor Relations page of the Company's website under "Governance —Corporate Policies". The Company intends to post any amendments to, or waivers from, the Code of Ethics and Business Conduct required to be disclosed by either SEC or NYSE regulations on the "Governance — Corporate Policies" section of the Investor Relations  page of the Company's website.

166.    Regarding the Board's role in risk management and oversight, the 2023 Proxy provided the following, in relevant part:

As part of the Company's risk management process, the Board regularly discusses with management the Company's major risk exposures, their potential financial impact on the Company, and the steps the Company takes to manage them. The Board also reviews the designation of the management person or entity responsible for managing such risks, and evaluates the steps being taken to mitigate the risks. The Board's monitoring role is carried out by either the full Board or a Committee that reports to the Board, depending on the risk in question. The Board has determined that a separate Risk Committee is not warranted at this time.

167.    The foregoing statements contained in the 2023 Proxy were materially false and misleading because, contrary to the assertions contained therein, the Individual Defendants failed to carry out their obligations related to risk management and failed to abide by the Code of

Conduct.

168.    Moreover, the 2023 Proxy was false and misleading as it failed to disclose that: (i) due to concerns regarding the COVID-19 pandemic's effect on the supply chain, FMC's distributors and retailers had stockpiled excess inventory; (ii) as a result of the excess inventories, demand for the Company's products began to decline significantly in 2022 and 2023; (iii) FMC's margins suffered and the Company experienced widespread product returns; (iv) demand for the Company's products decreased due to the entry of low-cost generic alternatives into key markets across the world; and (v) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### The Truth Regarding the Company's Revenue Slowdown Begins to Emerge

169.    On May 1, 2023, FMC issued a press release (the "May 2023 Press Release") announcing the Company's financial results for the first quarter of 2023. The May 2023 Press Release lowered the Company's second quarter 2023 outlook due in part to reduced demand attributable to several factors including "channel inventory management in India" and "Diamides partners adjusting inventory levels."

170.    The May 2023 Press Release quoted Defendant Douglas as stating that "FMC delivered a solid first quarter with strong pricing actions, growth of new products and cost discipline driving margin expansion. New product growth and expanded market access contributed to robust North America sales, which helped offset volume headwinds in other regions."

171.    Regarding the Company's 2023 guidance, the May 2023 Press Release provided the following:

> FMC is raising its full-year adjusted EBITDA guidance by $10 million at the midpoint. Full-year adjusted EBITDA is now expected to be in the range of $1.50

billion to $1.56 billion, representing 9 percent year-over-year growth at the midpoint based on the first quarter performance, continued pricing gains, positive product mix and projected input cost tailwinds.

172.    The May 2023 Press Release further quoted Defendant Douglas as stating:

We expect second quarter results to be largely in line with the prior year. We are raising our full-year EBITDA guidance, and narrowing our range, based on the first quarter performance and our expectation of continued pricing gains, positive mix supported by new products as well as input cost tailwinds that are projected to be realized in the second half of the year, particularly in the third quarter. The strength of our portfolio, diversity of crop mix and investments in market access have positioned us well to deliver another year of revenue and earnings growth as well as margin expansion.

173.    The following day, May 2, 2023, the Company hosted a related earnings call, during which Defendant Douglas stated, "We are raising guidance for full year adjusted EBITDA by $10 million based on the first quarter outperformance, continued pricing gains, positive mix and projected cost tailwinds. We now expect full year EBITDA to be in the range of $1.5 billion to $1.56 billion, representing 9% year-over-year growth at the midpoint."

174.    During the same call, Defendant Douglas was asked about the Company's "volume growth outlook." Defendant Douglas provided the following response:

The market is still operating at a very, very high level. On the ground usage is very robust in most part of the world. So the actual market itself is looking good in terms of soft commodity prices are remaining elevated, growers are looking to plant as much as they can . . . overall, the volume perspective as we go through the year will improve for FMC.

175.    Defendant Douglas was then asked "what gives you confidence that inventory levels aren't at risk to the back half or into next year? And kind of similarly on the diamides, where you talk about some partner channel destocking. What's the visibility that, that doesn't bleed into the second half as well?" In response, Defendant Douglas represented that inventory destocking was already accounted for in the Company's guidance:

I think on the channel inventories, we'll see how we go through the second quarter.

The markets are moving. You know what, if the market doesn't change much, yes, there will be some channel inventory hangover as we go into the next season. That occasionally happens. As the weather patterns improve as we go through the second quarter, we should be eating away at some of that inventory. So we'll see where the market gets to. Our expectation, as we're forecasting is for a more normal season as we enter Q4 and Q1 into next year in Latin America. On the diamides, what we're telling you in our guidance now is that the partners that are reducing inventories, that's not just an event now that continues through the rest of the year. So that's already built into our forward-looking guidance.

176.    On the same call, Defendant Sandifer stated the following regarding FMC's working capital and cash flow:

I think the pattern of our working capital and our cash flow for the year is very similar to what you've seen in the last 4 years, strongly negative in Q1, will be modestly positive in Q2, and then you see significant positive cash flows in Q3 and Q4 . . . we expect a normal pattern as we go through the rest of the year.

177.    On this news, the Company's share price declined more than 5%, from a close of $123.76 per share on May 1, 2023 to a close of $116.42 per share on May 2, 2023.

178.    On May 2, 2023, FMC filed a quarterly report on Form 10-Q with the SEC (the "1Q23 Form 10-Q"). The 1Q23 Form 10-Q incorporated the misleading risk disclosures regarding increased competition and the Company's ability to protect its intellectual property that were contained in the Company's previously filed annual reports.

179.    On May 9, 2023, Defendant Sandifer participated in the Goldman Sachs Industrials & Materials Conference, during which he stated the following regarding the Company's purported growth:

Look, we reported last week earnings EBITDA that was about $7 million above the midpoint of our guidance range with earning -- EPS is well above midpoint of guidance range. Revenue was a bit lighter than what we had guided. But overall, a strong quarter. And I think -- we think about what's going on in our space, another demonstration of our ability to deliver earnings as guided and predicted despite market conditions. And that's been very much a hallmark of FMC, particularly over the last 5 years, and our current iteration is a focused agricultural sciences company. In the quarter itself, a bit of revenue softness, two key spots drought in South and Southern Brazil and Argentina was a driver certainly in the lower volumes in the

quarter as was some lower volumes in the cereal herbicide markets in Europe. I'd say low growth in Asia was expected and a very, very strong growth in North America also expected. So I think generally, the quarter largely as expected, big -- the real surprise was a bit of softness in some of the core European markets, which I would attribute to both falling crop prices for cereals, a little bit of hesitancy in the channel there around the channel inventory levels and stocking. But in general, I'd say, overall, a solid quarter. So we have outperformed our guidance. We carried a little bit more than that through in a raise of guidance for the full year in part because we do feel confident in our ability to deliver at the midpoint of our guidance range, $1.53 billion in EBITDA for 2023 with about $6.15 billion in revenue. So what's changed? I think our guidance and our outlook for the year has always been predicated on growth, more balanced between price and volume than in previous years with pricing as a strong contributor mid-single-digit pricing for the year, a bit stronger than that in the first half, a little less than that in the second half, complemented by continued volume growth, basically independent of what market conditions are. We've been a steady compounding, growing 5% to 7%, actually a little bit above 7% compounded for 5 years now, irrespective of what the growth of the market has been in each year because it's really been driven by technology penetration, by new products and to a lesser degree and more recent degree by some investments we've made in expanding our market access by putting more people on the ground, agronomists, marketing salespeople to help people understand how help growers in particular, understand how best to utilize our products. And that's starting to really pull through some demand.

180.    During the same conference, Defendant Sandifer stated the following regarding

generic competitors of Rynaxypyr and Cyazypyr:

Some of the earliest patents which are around the composition of matter, composition of matter of the fundamental active ingredient molecules started rolling off last year. Despite that, there's not a single legal competitor in Rynaxypyr in the world today that said differently, that isn't buying it from us. Now there are illegal competitors and have been since before we bought the business. So there's been [illegal] material, particularly in China and India, always. But there are no current legal entrants in either of those markets where a the [sic] initial composition of matter patents have expired. And that's in part because that's just the beginning of the story around the patent protection. We have patents on manufacturing processes. And the diamides are 15- and 16-step process is to produce a molecule we have patents on many of those individual steps. We have patents on the composition, a matter of many of the intermediates that are produced in those steps. Many of those intermediates have no other commercial use of this to be made and further refined into being Rynaxypyr or Cyazypyr. We have patents on formulations of products. So while we had a couple of patents roll off last year, we also had a number of new patents granted, including for some value- added formulations of Rynaxypyr, some of the new product growth we were talking about earlier. So the patent of the state is not a static asset. It is something that we're

49

continuing to invest in, and we're continuing to renew. We have always presumed that over time, there would be generic entry into this marketplace. That's one of the reasons why we so aggressively pursued partnerships. . . . . So I think we've managed very aggressively that patent estate, the branding, the partnerships, continued innovation around those molecules. And while certainly, yes, we expect -- you're not going to grow doubling every 5 years forever, law of large numbers comes into play. But we do see that the diamide family continuing to compound in that mid-single-digit range through the rest of the decade and continue to grow profit dollars, not just growing revenue.

181.     Then, in response to a question regarding channel inventory in the Company's

LATAM region, Defendant Sandifer stated:

I'd say there's a couple of hotspots around the world, but generally, we're pretty comfortable with channel inventory overall around the world, places where we have a little -- some backup of channel inventory, Southern Brazil and Argentina, where there was a drought, and it was a pretty -- the consumption of crop chemicals was down a bit this year for the season that's wrapping up. Certainly, there's a little bit of channel inventory there    But we see in demand for crop
protection products being very, very healthy despite what may -- where there might be a little bit of channel inventory of different spots.

182.     On May 18, 2023, Defendant Douglas participated in the BMO Capital Markets

Global Farm to Market Conference, during which he stated the following with respect to FMC's

2023 volumes:

When you think about actual volumes on the ground, so what is the grower using, volumes are very good. So we're seeing acreage increase overall in Brazil, good conditions expected in the U.S., especially in the Midwest, other parts of the world in good condition . . . . So the actual volume on the ground, what a grower is using, it might not be as high as 2022, but that was a record year. We're still at extremely high volumes. Where the volume discussion is, is what is happening in retail and distribution. So we feel good about the ultimate volume. It's managing through what is essentially the end of all the COVID supply chain issues that we've had that are bouncing through distribution and retail. So my message is really good volumes down on the field. We see that all over the world. There are pockets where it's not so good, and we can talk about that later. But overall, volumes are good.

183.     Later during the conference, in response to a question regarding market dynamics

and channel inventories across the Company's different regions, Defendant Douglas stated:

Yes. Start off in North America. We feel very good about where the U.S. and

Canadian markets are. We had a very good first quarter, which is getting ready for the season. Obviously, the planting season, things are going well. So I think the U.S., assuming the weather patterns hold, should have a very, very good season. Don't forget, soft commodity prices are still high. They're not at record highs, but they're well above average. Most of the 10- and 5-year stock-to-use ratios for many of the soft commodities are below the averages. You have more weather impacts, as you just said around the world. So I think growers are feeling bullish about their ability to actually earn more money from what they're producing, which is always a good sign. So U.S., North America, all good. I would say, in Europe, Northern Europe, we're gearing up for the season once again. Northern Europe is in pretty good shape. Southern Europe is dry. You look at the press on what is happening in Spain, parts of Italy, northern part of Italy, a lot of rain. So guess what the trend is I'm talking about here, it's volatile weather patterns, much more than we ever used to see 10 years ago. But Europe, overall, pretty good. Southern Europe, a little dry. Asia, India, we've talked about a number of times. We have channel inventory in India, so do other people in the industry. A couple of bad years of monsoon, rice acreage reductions that is hopefully turning around this year. So we should work our way through that as we go through 2023. Australia, very dry, unexpectedly. We had 3 years of very good weather. Now we're in a drought situation in Australia, which impacted Q1 in Asia. Latin America, Brazil, the North Mexico, all good, the south of Brazil and Argentina, I think it's been well documented, extremely dry in Q4 and in Q1. That has continued. Argentina being the worst impacted. So I would expect channel inventories in Argentina or in the south of Brazil as we go through this season will remain elevated. So it's as usual, a mixture of what we see in the world. But what we do see is those more volatile weather patterns occurring all over the world now.

184.     Regarding patents for Rynaxypyr and Cyazypyr, Defendant Douglas stated:

It's been a fantastic acquisition for us 5 years ago. When we bought that set of products, they were about $1 billion in size. Today, they are $2.1 billion. So we've more than doubled that business in 5 years. The chemistry is some of the most recent chemistry as an insecticide. It's very targeted. It has a great environmental profile. What we've done over the last 5 years is a couple of things. First of all, there is a very strong patent estate around these products. The composition of matter patents for one of the main molecules came off last year. However, there are numerous process patents, et cetera, that follow on from that, that allow us patent protection in some countries through 2029. What we did was also apply for more registrations. So for a generalist in this industry, it's one of the most regulated industries in the world, and you cannot sell a product without a registration. And that registration basically says you can sell this product at these rates, application rates on this crop in this geography, and you can't sell without that. What we've done is applied for more registrations for these products around the world on different crops in different geographies. So we still have a long runway of registrations to come. Something like 60% to 70% of the registrations we have, there is an additional amount to come. So we know we have a runway of taking

share in markets where the products are not currently registered. That's good for us. It's good for the industry. The second piece is really the insecticide market is about a $16 billion market around the world. And there are some older chemistries that are losing their registrations around the world. Now when a product is removed from a registration, it means you can't sell it but the grower still needs products to sell -- to buy to take the pests away. So we're taking share from a lot of the older chemistries. So I think sort of the mid- to longer-term growth rate for these types of products are in the mid-single-digit range. I do see the fact that those molecules are very large now. I mean Rynaxypyr is one of the largest molecules in the world. You're reaching the law of big numbers. So mid-single digit for a $2.1 billion portfolio is a good growth rate. We believe that will continue as we -- as I said, take the registrations, take market share from older chemistries.

185.    On July 10, 2023, FMC issued a press release (the "July 2023 Press Release"). The July 2023 Press Release "provided an update for [FMC's] expectations on the second quarter and full-year 2023 outlook." Therein, Defendant Douglas disclosed the following:

Towards the end of May, we experienced unforeseen and unprecedented volume declines in three out of four operating regions, as our channel partners rapidly reduced inventory levels . . . Our full-year outlook for revenue and adjusted EBITDA has been revised to reflect these channel dynamics and their impact to volumes, as well as the benefit from improved input costs and the significant operating cost mitigation actions we have already implemented.

186.    On this news, the Company's share price declined more than 11%, from a closing price of $104.25 per share on Friday, July 7, 2023, to a closing price of $92.63 per share on Monday, July 10, 2023.

187.    On August 3, 2023, the Company hosted an earnings call to discuss the Company's financial results for the second quarter of 2023, during which Defendant Douglas was asked about demand for Rynaxypyr and Cyazypyr, as well as the impact of the entry of another competitor into the market. Defendant Douglas provided the following response:

So first of all, when we talk about supply and technical-grade diamides to our partners, think of us as essentially a raw material supplier. So they're treating as a raw material supplier, the same as we're treating our raw material suppliers. So it's nothing more than that. It is a simple case of they obviously have demands on their inventories that they're having to reduce, and we are part of that. We do that to our own suppliers and are doing it right now. So you see that. From a demand

perspective, we don't think their demand is slowing down at all, neither [is] ours, as we just commented on.

* * *

To the second part of your question with regards to competition in the U.S., we've seen competition for some time in many parts of the world with the diamides. What we do know is that our branded products and the new introductions that we're making of new formulations are moving the needle. In other words, we're not selling the same products that we were selling 5 years ago. We're selling more sophisticated, higher-concentration formulations to our current customers. So where generics are coming in with a certain type of product, we're not selling those products anymore. We're selling something completely different.

188.    During the same call, in response to a question regarding generic competitors in the

market, Defendant Douglas stated:

Listen, generics play a major role in the marketplace. They have been around and they are around. We don't necessarily play in a lot of those markets. It's not to say that the markets they play in are not valuable, they are, but we don't have a lot of generic pressure in a lot of our product lines, mainly because of how we differentiate through either new active ingredients or new formulations that we bring to market. So I expect the generic market to get more competitive, but we don't play in that space.

189.    Then, in response to a question regarding channel inventory destocking,

specifically with respect to the Company's previous long-term issues with destocking and how

things were different now, Defendant Douglas stated:

Yes. 2015, you've got to remember back to 2015, it seems a long time ago now, but that was a particular event in Brazil. It was both inventory, it's currency impact. And it was, again, that scarcity of products leading into that. I think this is different in the sense of it's broader and it's happening much faster. In other words, the decreases we're seeing on a quarterly basis right now, they're much more extreme than they were before. I think the other thing for us, in particular, although there was a lot of people impacted by the Brazilian event, there was a new seed trait that was introduced into Brazil for soybeans, which impacted insecticides within a reasonably short time frame. That was a factor that it's certainly not at play today in any way, shape or form. So I don't necessarily look back on Brazil as a proxy for what is happening today.

190.    On September 7, 2023, Blue Orca Capital published a report (the "Blue Orca

Report") that revealed previously undisclosed legal defeats that FMC had suffered in China and India related to the enforceability of the Company's patents for Rynaxypyr and Cyazypyr. The Blue Orca Report further detailed the influx and generic diamide products into the markets in India, China, and Brazil.

191.    Specifically, the Blue Orca Report disclosed how the Company "concealed from investors the deterioration of [its] core business[], resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits." The Blue Orca Report further disclosed that FMC "concealed from investors that it [had] suffered a recent string of stunning legal defeats around the globe that [had] enabled competitors to now launch competing generics at prices up to 80% below the price of FMC's flagship insecticide product," Rynaxypyr and Cyazypyr. The Blue Orca Report continued:

> Despite the expiration of the composition patents on FMC's diamides, FMC tells investors it will not face generic competition on its flagship products until 2026 at the earliest because FMC still holds a suite of 'process' patents, which FMC claims will bar generic entrants for the next several years. Absurdly, FMC even tells investors that 'there is not a single legal competitor . . . in the world today.' This is simply not true.

192.    On this news, the Company's share price declined 7.4% in one day, from a closing price of $82.19 per share on September 6, 2023 to a closing price of $76.10 per share on September 7, 2023.

193.    On October 23, 2023, the Company issued a press release (the "October 2023 Press Release") announcing a further reduction to FMC's third quarter and full-year 2023 revenue and earnings guidance, largely attributable to "substantially lower sales volumes in Latin America, particularly destocking in Brazil and to a lesser degree drought in Argentina." The October 2023 Press Release continued, quoting Defendant Douglas as stating:

> During the third quarter, we observed continued channel destocking in all regions;

however, the magnitude of the destocking in Brazil was much greater than we had anticipated. . . . While application of products by growers remains stable, significant global restocking impacts are expected to persist into next year and we have adjusted our full year outlook accordingly. With destocking conditions not expected to improve in the near-term, we have initiated an immediate restructuring process for our operations in Brazil and have launched a broader, more comprehensive process to review and adjust our total company cost structure.

194.    The Company substantially reduced its third quarter, fourth quarter and full-year 2023 revenue and Adjusted EBITDA guidance including a decrease in the full-year 2023 revenue guidance of 9.2% to 17.0% and a decrease in the full-year Adjusted EBITDA guidance of 20.8% to 30.7%.

195.    On this news, the price of FMC stock declined roughly 16.2%, from a closing price of $66.95 per share on October 20, 2023 to a closing price of $56.11 per share on October 24, 2023.

196.    Then, on October 30, 2023, the Company issued a press release (the "October 2023 Press Release") announcing financial results for its third quarter of 2023. The October 2023 Press Release reported that "[t]he company is lowering full-year free cash flow guidance to a range of negative $860 million to negative $640 million due to the reduction in expected second half EBITDA and the impacts to working capital from higher inventory and lower payables" and quoted Defendant Douglas as stating that "the global crop protection market remains challenged with severe destocking across the channel impacting volume growth this year. In this environment, we are implementing a company-wide restructuring program to right-size our cost base."

197.    The following day, the Company hosted a related earnings call, during which Defendant Sandifer disclosed the following:

As of September 30, gross debt-to-EBIDTA was 3.6x, while net debt-to-EBITDA was 3.3x, reflecting the sudden deceleration of our earnings beginning in Q2 and elevated debt levels due to higher workings capital resulting from this deceleration. The covenants to our revolving credit facility evaluate our leverage using a metric

that includes adjustments to both EBITDA and debt as reported. With these adjustments, covenant leverage was 3.8x as of September 30 relative to a maximum allowable of 4.0x. We do not view this as an acceptable leverage level relative to our covenant.

In light of this and the reduced outlook for Q4, we are currently in advanced discussions with our bank group to further amend our covenants to provide additional headroom for the company as we adjust our cost structure and debt levels to current market realities.

198.    On the same call, Defendant Sandifer also stated the following regarding the Company's cash flow generation and outlook:

FMC generated free cash flow of $32 million in Q3 down from $360 million in the prior year period. Cash from operations declined $316 million, with lower EBITDA and substantially lower payables as we adjust our operations to match current demand.

\* \* \*

Year-to-date cash flow through September 30 was negative $790 million, $651 million lower than the prior year period. Nearly all of the reduction stems from lower cash from operations, which was down substantially due to lower EBITDA and lower payables.

\* \* \*

We've reduced our free cash flow guidance for 2023 to negative $750 million at the midpoint, down from breakeven in our previous guidance. The reduction in full year cash flow outlook is a direct result of lower-than-expected second half EBITDA and the impact of reduced volumes on working capital.

199.    On this news, the Company's share price declined more than 8%, from a closing price of $57.96 per share on October 30, 2023, to a closing price of $53.20 per share on October 31, 2023.

***Project Focus is Implemented and the Individual Defendants Continue to Issue False and Misleading Statements***

200.    On November 16, 2023, during "FMC Investor Day 2023," the Company announced Project Focus. During this presentation, the Company assured investors that the Company "fully expect[ed] the destocking reset [was] transitory," and highlighted the Company's

alleged efforts to ensure that "the channel will begin to rebalance and ease back into somewhat more normal patterns" around "mid-2024." The Company also told investors that it expected "$50 million to $75 million of adjusted EBITDA contribution in 2024 from restructuring actions with approximately $150 million of run-rate savings by the end of 2025."

201.    During the November 16, 2023 presentation, Defendant Douglas was asked why he maintained confidence that channel inventories would normalize and "might be below normal now." Defendant Douglas responded as follows:

> Certainly when you think about where the industry is today, we're spending a lot more time talking to distribution, retail and where we have access to growers, talking to growers. That's happening in Asia, it's happening in Europe, certainly happening in the US and Brazil.

> I do think there are certain places and Brazil will get to that point where we see pockets of people drawing their inventories down below normal. That's going to happen. There are some places where it won't be below normal. But I do think in the US, we certainly know that at the grower level and at retail, the inventory levels are way below normal. But at the distribution level, as we enter the season, they're high. So that material will flow through the channel. It's already starting to flow through the channel. So we expect that to normalize pretty quickly.

202.    On December 18, 2023, the Company filed a Current Report on Form 8-K with the SEC that described Project Focus's goals as follows:

> In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking, which has materially impacted volumes in 2023, the Company has initiated a global restructuring plan, which we refer to as "Project Focus." This program is designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity. The Company's objective for Project Focus is to deliver $50 to $75 million in contributions to adjusted EBITDA in 2024. The Company is further targeting annual run-rate savings of $150 million or more by the end of 2025 from the program once fully implemented.

203.    On February 5, 2024, FMC issued a press release (the "February 2024 Press Release") announcing the Company's financial results for the fourth quarter and full 2023 fiscal year. The February 2024 Press Release claimed that FMC's products "delivered strong results

despite continued destocking." Moreover, Defendant Douglas was quoted in the press release as stating that in "the fourth quarter [FMC] observed continued channel destocking in all regions." The Company further stated that "[f]irst quarter revenue is expected to be in the range of $925 million to $1.075 billion, a 26 percent decrease at the midpoint compared to first quarter 2023 due to lower volume from destocking activity in all regions."

204.    On February 6, 2024, the Company hosted a related earnings call with investors and analysts. During the call, Defendant Sandifer was asked to comment on the amount of "working capital" that FMC could "extract in 2024, including inventory," and "what impact . . . [drawing down inventory] . . . will have on earnings." Defendant Sandifer responded as follows:

> I think certainly, as we're looking to free cash flow for 2024. Working capital, particularly accounts payable and to a lesser degree, inventory are really the big drivers of cash release in 2024. And that's in part because of an expectation as we go through the year, then we start rebalancing and production and inventory. We have been intentionally throttling back pretty severely manufacturing over the past two quarters and well into Q1. We would expect to see some ramping back up in manufacturing activity as we go through Q2 through Q4. That will help with bringing up accounts payable.

205.    On February 27, 2024, FMC filed an annual report on Form 10-K with the SEC (the "2023 Form 10-K"). The 2023 Form 10-K was signed by Defendants Sandifer, Brondeau, Douglas, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Verduin. The 2023 Form 10-K filing included certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX"), signed by Defendants Douglas and Sandifer, attesting to the accuracy of the accuracy of the financial statements contained therein and certifying that the 2023 Form 10-K "fully complie[d] with the requirements of Section 13(a) of the Securities Exchange Act of 1934."

206.    The 2023 Form 10-K described "channel inventory behavior" as a risk factor:

> Channel inventory behavior – The Company relies in many countries and in varying degrees on distribution channels to access the market and reach farmers or other end use customers. An abrupt and widespread shift in purchasing behaviors (e.g.,

the current inventory destocking phenomenon) by channel partners and end use customers has and may continue to negatively and materially impact the Company's volumes across important markets, which has adversely affected and may continue to adversely affect our results of operations. Such adverse effects could include but not be limited to materially reduced volumes purchased by customers, resulting in not only reduced sales, but also the Company bearing higher volumes of unsold product inventory, excess raw materials, and correspondingly increased carrying costs.

207.    On March 15, 2024, FMC filed a proxy statement on Schedule 14A with the SEC (the "2024 Proxy"). The 2024 Proxy was solicited by Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallas, and Verduin and called for FMC shareholders to vote to approve: (1) the reelection of Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Verduin to the Board; and (2) executive compensation.

208.    Regarding FMC's Code of Conduct, the 2024 Proxy provided:

The Company has a Code of Ethics and Business Conduct that applies to all directors, officers (including its Chief Executive Officer, Chief Financial Officer and Controller) and employees. It is posted on the Investor Relations page of the Company's website under "Governance —Corporate Policies" at investors.fmc.com/governance/corporate-policies/.

The Company intends to post any amendments to, or waivers from, the Code of Ethics and Business Conduct required to be disclosed by either SEC or NYSE regulations on the "Governance — Corporate Policies" section of the Investor Relations page of the Company's                      website                      at investors.fmc.com/governance/corporate-policies/.

209.    Regarding the Board's role is risk management and oversight, the 2024 Proxy provided the following, in relevant part:

As part of the Company's risk management process, the Board regularly discusses with management the Company's major risk exposures, their potential financial impact on the Company, and the steps the Company takes to manage them. The Board also reviews the designation of the management person or entity responsible for managing such risks, and evaluates the steps being taken to mitigate the risks. The Board's monitoring role is carried out by either the full Board or a Committee that reports to the Board, depending on the risk in question. The Board has

determined that a separate Risk Committee is not warranted at this time.

210.    The foregoing statements contained in the 2024 Proxy were materially false and misleading because, contrary to the assertions contained therein, the Individual Defendants failed to carry out their obligations related to risk management and failed to abide by the Code of Conduct.

211.    Moreover, the 2024 Proxy was false and misleading as it failed to disclose that: (1) Project Focus was not succeeding in significantly reducing Company inventory in the distribution channel; (2) the Company's channel inventories were getting worse; (3) Project Focus was failing to accelerate reduction in manufacturing cost; (4) the Company's cost-plus pricing agreements with several of its important distributors would drastically lower its revenues and profits near-term; and (5) as a result of the above, Defendants' positive statements regarding the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times.

212.    On May 6, 2024, FMC issued a press release (the "May 2024 Press Release") announcing the Company's financial results for the first quarter of 2024. The May 2024 Press Release quoted Defendant Douglas as stating that FMC's "second quarter revenue outlook includes volume growth for the first time since global destocking began in the second quarter of 2023."

213.    That same day, FMC hosted a related earnings call. During the call, Defendant Douglas stated:

> Data from third parties as well as input from our commercial teams, shows that the inventory reduction actions in the channel are making good progress. On a regional basis, the pace of destocking is varied. We see North America furthest along with inventories at the retail and grower level back to normal, while distributors are still working to reduce their level of inventory.

EMEA is in a similar condition, except in countries hit by unfavorable weather. In both these geographies, our customers are now targeting to operate with inventories at lower than normal levels. In Latin America, inventories are materially lower and are expected to trend towards more normal levels as we move through the rest of the year. We expect India destocking to persist well into 2025, but parts of Asia, such as ASEAN and Pakistan, have made strong progress in destocking in Q1.

While these activities continue to run their course, we're encouraged by the first signs that customers are starting to return to historical order patterns. In North America, we continue to receive orders for products that will be used early in the current season, which indicates that the inventories of such products have now been depleted. In Brazil, customers are now discussing next season's volumes, providing visibility that we did not have last year. Our full year outlook assumes that the market improves as the year progresses, but the customers will seek to hold lower levels of inventory.

We are forecasting our second quarter results to be similar to the prior year. Sales are expected to be between $1 billion and $1.15 billion, which represents a year-on-year growth of 6% at the midpoint, driven by higher volume. This is the first quarter during which we expect to report an improvement in year-over-year volume since the start of global destocking. Price is anticipated to be a headwind in the low- to mid-single digits and the FX outlook is neutral.

*** 

EBITDA in the second quarter is expected to be between $170 million and $210 million, up 1% versus the prior year at the midpoint. At the EBITDA midpoint, we expect that volume growth and restructuring benefits will be offset by lower price and COGS headwinds. Adjusted earnings per share is expected to be between $0.43 and $0.72, an increase of 15% at the midpoint, due mainly to lower interest expense and D&A.

214.    During the same call, Defendant Douglas was asked "[a]s inventory destocking comes to an end and as you get into 2025 . . . how do you see volume grow for the portfolio in 2025 and 2026?" In response, Defendant Douglas stated:

Listen, as we go through 2025, I think we've said that we expect what we would consider a more normal type of growth for the marketplace. Acres continue to grow, certainly, in Latin America and Brazil, so we expect that to be a driver. And don't forget, at that point, people will be then resetting from a lower level of inventory. So, you would expect more of a normal market growth. Typical market like this grows at anywhere from 2% to 3% per annum, and we generally speaking with our differentiated portfolio, outgrow the market in the long haul.

So, I think it's more about a normalized market. Demand on the ground, as we said, even in these conditions, is very good, we expect that to continue. As pressure continues to change, so we see that market piece as being pretty robust. Obviously, our NPIs are growing rapidly, so we would expect 2025 and 2026 to be actually faster than the growth we see in 2024.

And then, the other piece of which is not really market driven, but just a view of 2025, we have a lot of cost headwinds flowing against us right now that are obviously depressing our EBITDA and our EBITDA margin. Those turn into tailwinds as we go into next year and I think it's an important facet as we walk through the next couple of earnings calls, as we build out the picture of what 2025 is going to look like, you certainly have got a more stable, more robust external market. But we also have some pretty significant tailwinds in the sense of how we think about our P&L.

215.    On May 7, 2024, FMC filed a quarterly report on Form 10-Q with the SEC (the "1Q24 Form 10-Q"). The 1Q24 Form 10-Q filing included SOX certifications, signed by Defendants Douglas and Sandifer, attesting to the accuracy of the accuracy of the financial statements contained therein and certifying that the 1Q24 Form 10-Q "fully complie[d] with the requirements of Section 13(a) of the Securities Exchange Act of 1934." The 1Q24 Form 10-Q contained the following statement:

We expect 2024 free cash flow (Non-GAAP) to fall within a range of approximately $400 million to $600 million. At the mid-point of the range, there is a significant increase year over year driven largely by the rebuilding of payables and lower inventory. . . . In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking, we initiated the Project Focus global restructuring plan. This program is designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity.

216.    On May 15, 2024, Defendant Douglas participated in the BMO Global Farm to Market Conference. In his opening remarks of his presentation, Defendant Douglas stated the following regarding FMC's channel inventory levels:

I think many of you are aware of all the issues we've had coming out of COVID with supply chains, with destocking. That's something that's on everybody's mind. Certainly is on Andrew and I's – with my mind, I think as we go through the rest of this year and as we certainly go into 2025, you're going to start to see a more

normalization. It's not going to be smooth. It's going to be bumpy. But we're getting to the end of this destocking period, and I think that's an important facet for investors to recognize that supply chains can't empty forever and they have to replenish. That's the phase we're in now. We call it a transition this year. I think that's an apt description.

217.    During a question-and-answer session of his presentation, Defendant Douglas was asked about channel inventory levels in the Company's various regions. Defendant Douglas provided the following response:

Yeah, I think I think there's been a lot of commentary around the different regions of the world. North America is probably the furthest along, was one of the first regions to get hit by this change. I would say, distribution still a little high, retail and grower is very low. So North America is in pretty good shape. Europe's the next that is going through their season now. So they started to deplete last year. Depleting a lot more now. Asia is a mixed bag. India inventories are very high, that – we have high inventory, others in the industry have high inventory. That's mainly due to weather, though not necessarily the same dynamics as we see in the rest of the world. And then Latin America I mean, Latin America is finishing its season now. It's not bad. It's not exactly where it should be, but it's getting there. So as we roll into the 2024-2025 season in Q4 this year, it'll be in much better shape.

218.    On June 11, 2024, Defendant Sandifer participated in the 2024 Wells Fargo Industrials Conference. In the opening remarks of his presentation, Defendant Sandifer made the following statements regarding the Company's channel inventory levels:

We're actually sitting in places where inventories are well below what has been historically held in the channel. And we have a few places where we're a little slow to meet an order occasionally because we don't always have every single product on the shelf someone might want. There's a reason these products are carried in inventory during a growing season.

The demand for them can be fickle and hard to predict. When bugs show up in your field, you need an insecticide today. Not two weeks from now, not five weeks from now, you need it today. So we are seeing these things rebalance. The timing and the magnitude of that rebalancing $324 million is a bit, it is a complicated issue we're working through. But I think fundamentals here, the in market demand is still strong as the channel inventory corrects. And we get more in sync the flow from manufacturers through the distribution channel into the grower hands, we will see a rebalancing and a rebasing of the business.

And that's where we see a pivot back to FMC of all in terms of our ability to drive

growth with technology, with differentiation and with a closeness to customers and there's certainly places we can put down here on all those topics.

219.    During the question-and-answer portion of his presentation, Defendant Sandifer was asked whether "as we enter 2025, the expectation is that inventories at that point should be at a place where?" In response, Defendant Sandifer stated:

> Yeah, I think as we move into 2025, look I'm very careful about using the word normal because we've been through a period in the last five years. And I think anybody who tries to define normal at this point to fool's game. What we are seeing is improving conditions. We are seeing channel inventories reduce, we will see a rebalancing, a resining of pull through by growers from all the way back up channel back to manufacturers where that's been broken in the past four quarters as that channel, the inventory that built up in between needed to be drawn down.

220.    Then, on June 11, 2024, FMC filed a Current Report on Form 8-K with the SEC announcing that Defendant Douglas had resigned from his roles of President and CEO and as a member of the Board, and that the Board had appointed Defendant Brondeau to succeed Defendant Douglas as CEO.

221.    On July 31, 2024, the Company issued a press release (the "July 2024 Press Release") announcing its financial results for the second quarter of 2024. The July 2024 Press Release quoted Defendant Brondeau as stating that "[d]emand improved during the second quarter, resulting in a pronounced increase in [FMC's] sales volumes, most notably within the United States and Brazil, despite customers continuing to actively manage inventory" and that "[FMC] expect[s] demand to increase as the year progresses even as customers maintain a careful approach of managing inventory."

222.    On August 1, 2024, FMC filed a quarterly report on Form 10-Q with the SEC (the "2Q24 Form 10-Q"). The 2Q24 Form 10-Q filing included SOX certifications, signed by Defendants Brondeau and Sandifer, attesting to the accuracy of the accuracy of the financial statements contained therein and certifying that the 2Q24 Form 10-Q "fully complie[d] with the

requirements of Section 13(a) of the Securities Exchange Act of 1934." The 2Q 2024 10-Q stated that the Company had been working to implement Project Focus's restructuring plan to "right-size [FMC's] cost base and optimize [FMC's] footprint and organizational structure with a focus on driving significant cost improvement and productivity." Therein, FMC further stated that it "expect[ed] the plan to be fully executed by the end of 2025."

223.    On August 1, 2024, FMC held a related earnings call. During the call, Defendant Brondeau stated that FMC "delivered a solid Q2, helped by the successful execution of [FMC's] restructuring program." Furthermore, Defendant Brondeau stated that FMC "expect[ed] continued growth in Q3 and Q4 from demand recovery, led by the Americas, where we expect channel inventory to approach normal levels by year-end."

224.    During the same call, Defendant Brondeau stated that "Q2 through Q4 also show higher revenue driven by volume with the rate of growth accelerating in Q4 as we shift into the next crop season. The markets have begun to recover as channel inventories are starting to normalize, even if not as fast as [FMC] had previously expected."

225.    On October 29, 2024, FMC issued a press release (the "October 2024 Press Release") announcing the Company's financial results for the third quarter of 2024. The October 2024 Press Release reported that "[r]evenue growth in the quarter of 9 percent was driven by a 17 percent increase in volume, with some North America second half orders occurring earlier than expected due to improved channel inventory levels."

226.    On October 30, 2024, FMC filed a quarterly report on Form 10-Q with the SEC (the "3Q24 Form 10-Q"). The 3Q24 Form 10-Q filing included SOX certifications, signed by Defendants Brondeau and Sandifer, attesting to the accuracy of the accuracy of the financial statements contained therein and certifying that the 3Q24 Form 10-Q "fully complie[d] with the

requirements of Section 13(a) of the Securities Exchange Act of 1934." The 3Q24 Form 10-Q stated that the Company had been actively implementing Project Focus's restructuring plan to "right-size [FMC's] cost base and optimize FMC's] footprint and organizational structure with a focus on driving significant cost improvement and productivity. Furthermore, the 3Q24 Form 10-Q stated that FMC "expect[ed] the plan to be fully executed by the end of 2025."

227.    That same day, the Company hosted a related earnings call, during which Defendant Brondeau stated:

> Looking ahead, our view on the timeline of channel inventory recovery is relatively unchanged from what we communicated during our August earnings call. The U.S. and most countries in Europe are normalizing the fastest and Latin America is expected to be much improved in the second quarter of 2025. Asia markets are still expected to be very challenging in 2025 with no recovery expected until 2026 as India continues to work through excess channel inventory.
>
> On a cost basis, we are accelerating the delivery of savings and increasing our targets. We are now targeting cost benefits from 6 restructuring of $125 million to $150 million to be reflected in the P&L in 2024, with greater than $225 million of gross run-rate in 2025. To accomplish this, we are accelerating restructuring, taking new critical initiatives to realign our manufacturing footprint, and using attrition as a key tool to drive further savings.

228.    On December 4, 2024, Defendant Brondeau participated in the Goldman Sachs Industrials and Materials Conference. During his presentation, Defendant Brondeau was asked about channel inventory, specifically, whether FMC is "where you want to be all the way through the chain, or do you think there's still some more inventory to come out?" In response, Defendant Brondeau stated:

> I think it's very region dependent. We are pretty comfortable with North America and Europe. Things are happening well in Latin America and Brazil, Argentina, where we see product going through the channel with the season, which is turning out despite the delay in rain, pretty good. So we believe Latin America will get by a normalized channel toward the second quarter.

229.    The above statements were materially false and misleading. Specifically, the

Individual Defendants failed to disclose that: (1) Project Focus was not succeeding in significantly reducing Company inventory in the distribution channel; (2) the Company's channel inventories were getting worse; (3) Project Focus was failing to accelerate reduction in manufacturing cost; (4) the Company's cost-plus pricing agreements with several of its important distributors would drastically lower its revenues and profits near-term; and (5) as a result of the above, Defendants' positive statements regarding the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times.

**The Truth is Fully Revealed**

230.    On February 4, 2025, FMC issued a press release (the "February 2025 Press Release") announcing the Company's financial results for the fourth quarter of 2024, reporting that it missed consensus revenue estimates by $90 million. The February 2025 Press Release also disclosed that growth was far below the Company's predictions "as [it] learned during the quarter that customers in many countries sought to hold significantly less inventory than they have historically."

231.    The February 2025 Press Release further disclosed that the Company expected revenue to remain flat as a result of "weaker demand in the channel as customers in many countries prioritize holding lower-than-historical levels of inventory."

232.    During a related earnings call that same day, the Company revealed that its cost-plus pricing arrangements with certain of its diamide wholesalers would cause a $130 million EBITDA headwind for 2025. During the same call, the Company announced that it "need[s] to significantly lower FMC inventory in the channel much beyond what we were expecting."

233.    On this news, the Company's share price declined more than 33%, from a closing price of $54.04 on February 4, 2025, to a closing price of $35.92 per share on February 5, 2025.

## THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO REPURCHASE ITS OWN COMMON STOCK AT INFLATED PRICES

234.    During the Relevant Period, FMC repurchased its own shares at artificially inflated prices, causing substantial damage to the Company. In total, the Company expended over $216 million repurchasing approximately 1.8 million shares of its own common stock at prices that did not reflect the actual value of the stock. As a result, FMC overpaid for repurchases during the relevant period by approximately $116 million.

| Date Range | Shares | Average Share Price | Total Expended |
|---|---|---|---|
| February 1 - 28, 2022 | 78,942 | $115.36 | $9,106,749.12 |
| March 1 - 31, 2022 | 5,405 | $112.47 | $607,900.35 |
| April 1 - 30, 2022 | 216 | $136.93 | $29,576.88 |
| May 1 - 31, 2022 | 128 | $116.18 | $14,871.04 |
| June 1 - 30, 2022 | 216 | $105.42 | $22,770.72 |
| July 1 - 31, 2022 | 2,829 | $106.81 | $302,165.49 |
| August 1 - 31, 2022 | 303 | $73.18 | $22,173.54 |
| September 1 - 30, 2022 | 130 | $106.27 | $13,815.10 |
| October 1 - 31, 2022 | 875,724 | $114.22 | $100,025,195.28 |
| November 1 - 30, 2022 | 399 | $120.29 | $47,995.71 |
| December 1 - 31, 2022 | 33 | $126.61 | $4,178.13 |
| January 1 - 31, 2023 | 577 | $127.26 | $73,429.02 |
| February 1 - 28, 2023 | 364,085 | $129.01 | $46,970,605.85 |
| March 1 - 31, 2023 | 36,776 | $128.38 | $4,721,302.88 |
| April 1 - 30, 2023 | 2,551 | $120.57 | $307,574.07 |
| May 1 - 31, 2023 | 464,999 | $109.42 | $50,880,190.58 |
| June 1 - 30, 2023 | 43 | $105.55 | $4,538.65 |
| July 1 - 31, 2023 | 373 | $95.61 | $35,662.53 |
| August 1 - 31, 2023 | 1,480 | $88.10 | $130,388.00 |
| September 1 - 30, 2023 | 2,151 | $75.34 | $162,056.34 |
| October 1 - 31, 2023 | 829 | $63.04 | $52,260.16 |
| November 1 - 30, 2023 | 882 | $53.43 | $47,125.26 |
| December 1 - 31, 2023 | 726 | $55.88 | $40,568.88 |
| January 1 - 31, 2024 | 1,482 | $57.95 | $85,881.90 |
| February 1 - 29, 2024 | 31,033 | $52.44 | $1,627,370.52 |
| March 1 - 31, 2024 | 7,306 | $59.63 | $435,656.78 |
| April 1 - 30, 2024 | 930 | $57.84 | $53,791.20 |

| | | | |
|---|---|---|---|
| May 1 - 31, 2024 | 1,977 | $64.42 | $127,358.34 |
| June 1 - 30, 2024 | 791 | $56.28 | $44,517.48 |
| July 1 - 31, 2024 | 2,181 | $58.07 | $126,650.67 |
| August 1 - 31, 2024 | 2,024 | $61.46 | $124,395.04 |
| September 1 - 30, 2024 | 5,288 | $65.87 | $348,320.56 |
| October 1 - 31, 2024 | 635 | $62.33 | $39,579.55 |
| November 1 - 30, 2024 | 1,401 | $56.65 | $79,366.65 |
| December 1 - 31, 2024 | 935 | $49.96 | $46,712.60 |
| January 1 - 31, 2025 | 3,293 | $55.26 | $181,971.18 |
| **Total** | **1,899,073** | | **$216,944,666.05** |

235.    Between February 1, 2022 and October 31, 2023, the Company's stock was actually worth $53.20 per share, the price at closing on October 31, 2023, when the truth regarding FMC's revenue slowdown was revealed. Between November 1, 2023 and January 31, 2025, the Company's stock was actually worth $35.92 per share, the price at closing on February 5, 2025, when the truth was fully revealed.

236.    As a result, the Company overpaid by approximately $116 million for repurchases of its own common stock during the Relevant Period.

## THE INDIVIDUAL DEFENDANTS SOLD COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

237.    As a result of the false and misleading statements the Individual Defendants caused FMC to make, the Company's share price was artificially inflated. Defendants Douglas, Sandifer, Brondeau, Johnson, and Volpe, while in possession of material, nonpublic information, capitalized on the artificially inflated stock price by selling 74,862 shares of FMC common stock for total gross proceeds of approximately $9 million, avoiding losses of approximately $5 million. The Individual Defendants' insider sales, made with knowledge of material, nonpublic information, demonstrate their motive in facilitating and participating in the wrongdoing.

238.    During the Relevant Period, Defendant Douglas made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided[1] |
|---|---|---|---|---|
| 2/22/2022 | $116.89 | 2,041 | $238,572.49 | $129,991.29 |
| 2/24/2022 | $114.69 | 5,216 | $598,223.04 | $320,731.84 |
| 2/23/2023 | $128.73 | 8,477 | $1,091,244.21 | $640,267.81 |
| 2/27/2023 | $128.78 | 3,359 | $432,572.02 | $253,873.22 |
| **Total** | | | **$2,360,611.76** | **$1,344,864.16** |

239.    During the Relevant Period, Defendant Sandifer made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 2/22/2022 | $116.89 | 1,312 | $153,359.68 | $83,561.28 |
| 2/24/2022 | $114.69 | 2,806 | $321,820.14 | $172,540.94 |
| 3/4/2022 | $119.36 | 4,997 | $596,441.92 | $330,601.52 |
| 2/23/2022 | $128.73 | 1,482 | $190,777.86 | $111,935.46 |
| 2/27/2023 | $128.87 | 983 | $126,679.21 | $74,383.61 |
| 3/3/2023 | $127.77 | 5,000 | $638,850.00 | $372,850.00 |
| **Total** | | | **$2,027,928.81** | **$1,145,872.81** |

240.    During the Relevant Period, Defendant Brondeau made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 2/22/2022 | $116.89 | 5,844 | $683,105.16 | $372,204.36 |
| 2/24/2022 | $114.69 | 23,935 | $2,745,105.15 | $1,471,763.15 |
| 2/23/2023 | $128.73 | 5,361 | $690,121.53 | $404,916.33 |
| 2/27/2023 | $128.87 | 2,318 | $298,720.66 | $175,403.06 |
| **Total** | | | **$4,417,052.50** | **$2,424,286.90** |

---

[1] Calculated using the $53.20 closing price on October 31, 2023.

241.    During the Relevant Period, Defendant Johnson made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 1/3/2023 | $124.80 | 37 | $4,617.60 | $2,649.20 |

242.    During the Relevant Period, Defendant Volpe made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 4/27/2022 | $119.82 | 1,694 | $202,975.08 | $112,854.28 |

## DAMAGES TO FMC

243.    As a direct and proximate result of the Individual Defendants' misconduct, FMC has expended and will continue to expend significant sums of money.

244.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

245.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

246.    FMC has also suffered, and will continue to suffer, a loss of reputation and goodwill as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward due to their misrepresentations.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

247.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

248.    Plaintiff brings this action derivatively in the right and for the benefit of FMC to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, unjust enrichment, violations of Sections 14(a) and 10(b) of the Exchange Act, and other wrongful conduct as alleged herein.

249.    Plaintiff has owned FMC common stock since before the beginning of the Relevant Period and has continuously been an owner of Company stock during all relevant times.

250.    Plaintiff will adequately and fairly represent the interests of FMC and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

251.    A pre-suit demand on the Board is futile and therefore excused. At the time this action commenced, the Board consisted of thirteen directors – Defendants Brondeau, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Verduin (the "Director Defendants"), as well as Non-Parties DiSilvestro, Merkt, and Raines. All thirteen members of the Board are incapable of exercising independent objective judgment and/or making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

252.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct, as they were directors during the time of the false and misleading statements and as such had a fiduciary duty to ensure that FMC's SEC filings, press releases, and other public statements and presentations on behalf of FMC concerning its business, operations, prospects, internal controls, and financial statements were accurate.

253.    The Director Defendants owed a duty to, in good faith and with due diligence,

exercise reasonable inquiry, oversight, and supervision to ensure that FMC was acting legally and its internal controls were sufficiently robust and effective, and to ensure that the Board's duties were being discharged in good faith and with the required diligence. Instead, they reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused FMC's stock to trade at artificially inflated prices.

254.    The Director Defendants knowingly and consciously allowed the authorization of false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that FMC's internal controls were sufficiently robust and effective, and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These knowing and conscious failures breached the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

255.    The Director Defendants will not bring a suit on behalf of FMC to recover damages sustained because of this misconduct because they would expose themselves to significant liability. As such, demand is futile as to the Director Defendants.

256.    Demand upon Defendant Brondeau is futile for the following reasons. Defendant Brondeau has served as the Company's CEO since June 2024 and as Chairman of the Board since 2010. As FMC admits in its SEC filings, Defendant Brondeau is not an independent director for purposes of demand futility. In addition, the Company provides Defendant Brondeau with his principal occupation, for which he receives significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Brondeau breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

257.    Demand upon Defendant Cordeiro is futile for the following reasons. Defendant Cordeiro has served as a Company director since 2011. The Company provides Defendant Cordeiro with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Cordeiro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

258.    Demand upon Defendant Davidson is futile for the following reasons. Defendant Davidson has served as a Company director since 2020. The Company provides Defendant Davidson with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Davidson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

259.    Demand upon Defendant Fortmann is futile for the following reasons. Defendant Fortmann has served as a Company director since 2022. The Company provides Defendant Fortmann with significant compensation as detailed above. As a trusted Company director, she conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Fortmann breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

260.    Demand upon Defendant Greer is futile for the following reasons. Defendant Greer has served as a Company director since 2002. The Company provides Defendant Greer with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Greer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

261.    Demand upon Defendant Johnson is futile for the following reasons. Defendant Johnson has served as a Company director since 2013. The Company provides Defendant Johnson with significant compensation as detailed above. As a trusted Company director, she conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Johnson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

262.    Demand upon Defendant Kempthorne is futile for the following reasons. Defendant Kempthorne has served as a Company director since 2009. The Company provides Defendant Kempthorne with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Kempthorne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

263.    Demand upon Defendant Øvrum is futile for the following reasons. Defendant Øvrum has served as a Company director since 2016. The Company provides Defendant Øvrum

with significant compensation as detailed above. As a trusted Company director, she conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Øvrum breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

264.    Demand upon Defendant Pallash is futile for the following reasons. Defendant Pallash has served as a Company director since 2008. The Company provides Defendant Pallash with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Pallash breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

265.    Demand upon Defendant Verduin is futile for the following reasons. Defendant Verduin has served as a Company director since 2023. The Company provides Defendant Verduin with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Verduin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

266.    Demand upon DiSilvestro is futile for the following reasons. DiSilvestro has served as a Company director since December 2024. The Company provides DiSilvestro with significant compensation as detailed above. As such, DiSilvestro cannot independently or impartially consider any demand adverse to the Director Defendants serving on the Compensation Committee who

determine DiSilvestro's compensation. DiSilvestro therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon DiSilvestro is thus futile.

267. Demand upon Raines is futile for the following reasons. Raines has served as a Company director since 2024. The Company provides Raines with significant compensation as detailed above. As such, Raines cannot independently or impartially consider any demand adverse to the Director Defendants serving on the Compensation Committee who determine Raines's compensation. Raines therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Raines is thus futile.

**Additional Reasons Demand is Futile**

268. Defendants Cordeiro, Davidson, and Pallash served as members of the Audit Committee during the Relevant Period. The Audit Committee is required to oversee, among other things, the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein. In violation of the Charter, Defendants Cordeiro, Davidson, and Pallash failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Cordeiro, Davidson, and Pallash further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

269. FMC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused FMC to take action to recover the damages FMC has suffered and will continue to suffer thereby.

270.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause FMC to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

271.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

272.    The Director Defendants' conduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of FMC. Accordingly, demand is excused as being futile.

273.    Publicly traded companies, such as FMC, typically carry director and officer liability insurance from which FMC could potentially recover some or all of its losses. However,

such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover FMC's damages. If no such insurance is carried, then the Director Defendants will not cause FMC to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

274.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIM I

### Against The Individual Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

275.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

276.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

277.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false

or misleading." 17 C.F.R. § 240.14a-9.

278.    Under the direction and watch of the Individual Defendants, the 2023 Proxy and the 2024 Proxy failed to disclose that the Individual Defendants had violated the Code of Conduct and that the Board's risk oversight mechanisms were evidently inadequate given the aforementioned misconduct.

279.    The 2023 Proxy and the 2024 Proxy also failed to disclose that: (i) due to concerns regarding the COVID-19 pandemic's effect on the supply chain, FMC's distributors and retailers had stockpiled excess inventory; (ii) as a result of the excess inventories, demand for the Company's products began to decline significantly in 2022 and 2023; (iii) FMC's margins suffered and the Company experienced widespread product returns; and (iv) demand for the Company's products decreased due to the entry of low-cost generic alternatives into key markets across the world; and (v) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

280.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy and the 2024 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy and the 2024 Proxy, including, but not limited to, the reelection of Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, and Pallash to the Board, thus allowing them to continue breaching their fiduciary duties to FMC.

281.    FMC was damaged because of the Individual Defendants' material

misrepresentations and omissions in the 2023 Proxy and the 2024 Proxy.

282.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## CLAIM II

### Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act

283.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

284.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

285.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

286.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about FMC not misleading.

287.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by FMC.

288.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were directly responsible for the false and misleading statements and omissions disseminated to the public through press releases and filings with the SEC.

289.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of FMC, their control over, and/or receipt and/or modification of FMC's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning FMC, participated in the fraudulent scheme alleged herein.

290.    As a result of the foregoing, the market price of FMC common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff, relied on the statements described above and/or the integrity of the market price of FMC common stock in purchasing FMC common stock at prices that were artificially inflated as a result of these false and misleading statements and was damaged thereby.

291.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

292.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## CLAIM III

### Against Defendants Douglas and Sandifer for Contribution Under Sections 10(b) and 21D of the Exchange Act

293.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

294.    The conduct of Defendants Douglas and Sandifer as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

295.    FMC, Douglas and Sandifer are named as defendants in the Securities Class Action that alleges and asserts claims arising under the federal securities laws. FMC is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

296.    If FMC is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants Douglas and Sandifer as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. FMC is entitled to contribution and indemnification from Defendants Douglas and Sandifer in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

297.    As officers and/or directors, Defendants Douglas and Sandifer had the power or ability to, and did, control or influence, either directly or indirectly, FMC's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

298.    Defendants Douglas and Sandifer are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

299.    Defendants Douglas and Sandifer have damaged the Company and are liable to the Company for contribution.

300.    As such, FMC is entitled to receive all appropriate contribution or indemnification from Defendants Douglas and Sandifer.

## CLAIM IV

**Against the Individual Defendants for Breach of Fiduciary Duties**

301.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

302.     By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

303.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

304.     The Individual Defendants knowingly issued false financial statements and made false and misleading statements regarding FMC's business operations, practices, and international controls in connection therewith, as alleged herein. These actions could not have been a loyal and good faith exercise of prudent business judgment to protect and promote FMC's corporate interests.

305.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, FMC has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

306.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

307.     Plaintiff, on behalf of FMC, has no adequate remedy at law.

## CLAIM V

**Against the Individual Defendants for Gross Mismanagement**

308.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

309.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

310.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, FMC has sustained significant damages in excess of hundreds of millions of dollars and will continue to sustain significant damages.

311.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

312.    Plaintiff, on behalf of FMC, has no remedy at law.

## CLAIM VI

### Against the Individual Defendants for Waste of Corporate Assets

313.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

314.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

315.    As a result of the misconduct described above, and by failing to properly consider the interests of FMC and its public shareholders, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring

potentially millions of dollars of legal liability and/or legal costs to investigate and defend Defendants' unlawful actions; and (iv) causing the loss of financing from investors and business from future customers who no longer trust FMC and its products.

316.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

317.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## CLAIM VII

### Against the Individual Defendants for Unjust Enrichment

318.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

319.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, FMC.

320.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

321.    Additionally, at the time of their stock sales set forth herein, Defendants Douglas, Sandifer, Brondeau, Johnson, and Volpe knew of the information described above, and sold FMC common stock on the basis of such information. Their sales of FMC common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

322.    Plaintiff, as a shareholder and representative of the Company seeks restitution

from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## CLAIM VIII

### Against Defendants Douglas, Sandifer, Brondeau, Johnson, and Volpe for Insider Selling

323.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

324.     By reason of their fiduciary roles as officers, directors, and/or controlling persons of FMC, Defendants Douglas, Sandifer, Brondeau, Johnson, and Volpe (the "Insider Selling Defendants") specifically owed FMC the highest obligation of due care, good faith, and loyalty.

325.     As officers, directors, and/or controlling persons of the Company, the Insider Selling Defendants were given access, directly or indirectly, to material information about the Company, as described above, which was not generally available to the public.

326.     When the Insider Selling Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information, and sold Company stock on the basis of such information; information which they each knew had a significant effect on the market price of the Company's stock.

327.     The information described above was proprietary, non-public information concerning the Company's business operations and financial condition. It was a proprietary asset belonging to FMC, which the Insider Selling Defendants misappropriated to their own benefit when they sold holdings in Company stock. The Insider Selling Defendants knew that this information was not intended to be available to the public. Had such information been generally

available to the public, it would have significantly reduced the market price of Company stock.

328.    As the use of FMC's proprietary information for their own personal gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, FMC is entitled to disgorge any illegal profits obtained thereby.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 9, 2025                        Respectfully submitted,

                                            **THE ROSEN LAW FIRM, P.A.**

                                            */s/ Olivia D. Simkins*

Olivia D. Simkins (PA ID: 336339)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817

Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

## **VERIFICATION**

       I, Mark Beard am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:  Executed by:  6/14/2025

DA106D333810433...

Mark Beard